Richard A. MOTTOLO, et al.

v.

FIREMAN'S FUND INSURANCE
COMPANY, et al.

Civ. No. 89–320–JD.

United States District Court,
D. New Hampshire.

Aug. 16, 1993.

---

Mark S. Gearreald, Stratham, NH, for plaintiffs.

John L. Putnam, Stephen H. Roberts, Dover, NH, Kevin C. Devine, Manchester, NH, William G. Scott, Portsmouth, NH, Waltraut S. Addy, Washington, DC, for defendants.

## ORDER

DiCLERICO, Chief Judge.

Plaintiffs Richard Mottolo and Service Pumping and Drain Co., Inc. ("Service") have filed this declaratory judgment action pursuant to 28 U.S.C.A. § 2201 (West Supp.1993) against defendants Fireman's Fund Insurance Company ("Fireman's Fund"), United States Fidelity & Guaranty Company ("USF & G") and Aetna Casualty and Surety Company ("Aetna").[1] The plaintiffs seek a decla-

---

1. The plaintiffs also named as defendants The Netherlands Insurance Company ("Netherlands") and Crum & Forster Insurance Company ("Crum & Forster"). On December 4, 1989, the court granted the Netherlands's motion to dismiss the action against it. The plaintiffs consented to the dismissal. In its answer, Crum & Forster alleged it had not issued any insurance policies to the plaintiffs. Crum & Forster has not joined in the defendants' motion for summary judgment.

ration of the parties' rights and duties with respect to insurance coverage in two underlying lawsuits against the plaintiffs. In those lawsuits, federal and state officials alleged the plaintiffs dumped hazardous wastes at a site on Blueberry Hill Road ("the site") in Raymond, New Hampshire. *See generally,* United States v. Mottolo ("*Mottolo I* "), 695 F.Supp. 615 (D.N.H.1988).

The defendants have moved for summary judgment, arguing the damages resulting from plaintiffs' waste disposal activity did not arise from an "occurrence," as defined in their insurance policies, for which they are obligated to indemnify the plaintiffs. The plaintiffs objected and filed cross-motions for summary judgment. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Abbadessa v. Moore Business Forms, Inc.,* 987 F.2d 18, 22 (1st Cir.1993). For the following reasons, the court finds there is no genuine issue of material fact that the plaintiffs' damages did not result from an "occurrence" for which the defendants are obligated to indemnify the plaintiffs and therefore grants the defendants' motion for summary judgment.[2]

### Background

An off-duty local police officer discovered the site while hunting and reported it to authorities. *Mottolo I,* 695 F.Supp. at 618. Subsequent on-site investigation by the State of New Hampshire revealed a dump in which a large number of drums and pails of liquid waste had been compacted by bulldozers or other earthmoving equipment and partially buried. *Id.* The contents of at least two tank trucks of hazardous chemicals were discharged directly onto the soil surface at the site. *Id.* at 623.

In or about May 1979, Mottolo met with New Hampshire officials who informed him he would be responsible for the cleanup of the site. *Mottolo v. United States Fidelity & Guar. Co.* ("*Mottolo II* "), 127 N.H. 279, 280, 498 A.2d 760 (1985). In or about July 1979, the State of New Hampshire brought suit against Mottolo, seeking a permanent injunction against future disposal activities and an abatement of a public nuisance resulting from the previous dumping at the site. *Id.* at 281, 498 A.2d 760. In the spring of 1980, the State of New Hampshire requested the United States Environmental Protection Agency ("EPA") to conduct removal operations at the site. *Mottolo I,* 695 F.Supp. at 619. Between September 1980 and February 1982, the EPA conducted excavation operations at the site, which confirmed the containers at the site had been thrown haphazardly atop each other among boulders, that the majority of containers were crushed, punctured, corroded, and disfigured, and that many of the containers were leaking. *Id.* The EPA ultimately recovered more than 1650 drums and other smaller containers, all of which held or had held numerous toxic, flammable, corrosive, irritant and explosive materials. *Id.* The hazardous chemical wastes the EPA found at the site included, *inter alia,* acetone, toluene, trichlorethylene, xylene, butyl acetate, methanol, methylene chloride, methyl methacrylate, methyl ethyl ketone, and methyl isobutyl ketone. *Id.* at 623.

On September 8, 1983, the EPA instituted a cost recovery action against the plaintiffs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601 *et seq.* (West 1983 & Supp.1993) to recoup costs expended cleaning up the site. *Mottolo I,* 695 F.Supp. at 623. In February 1984, the State of New Hampshire also filed suit against the plaintiffs under CERCLA to recoup costs expended assisting the EPA dur-

---

**2.** The defendants also argued they were not obligated to provide coverage because the plaintiffs' expenses are not "damages" as defined in the policies. The parties agree the New Hampshire Supreme Court's decision in *Coakley v. Maine Bonding & Casualty Co.,* 136 N.H. 402, 618 A.2d 777 (1992), resolves the legal question regarding damages. The defendants also raise additional arguments for a grant of summary judgment in their favor, including the "sudden and accidental" exception to the pollution exclusion clause, the owned-property exclusion, the statute of limitations and laches. In view of the court's finding, the court need not address these arguments.

ing the cleanup of the site. Both the EPA and the State of New Hampshire specifically sought recovery of costs incurred to remediate contamination existing solely on the site. The cases were consolidated for trial. On September 30, 1987, the EPA and the State of New Hampshire moved for summary judgment seeking, *inter alia*, a declaration requiring the plaintiffs to reimburse the EPA and the State of New Hampshire for their costs incurred in cleaning up the site. *Id.* On August 28, 1988, the court granted in part the motion for summary judgment, finding Mottolo and Service jointly and severally liable for all response and remedial costs the EPA and State of New Hampshire incurred as a result of the conditions at the site. *Id.* at 631.

### Discussion

#### A. Duty to Indemnify

 The court determines an insurer's duty to indemnify the insured by considering whether the allegations against the insured fall within the express terms of the policy. *United States Fidelity & Guar. Co., Inc. v. Johnson Shoes, Inc.*, 123 N.H. 148, 151–52, 461 A.2d 85 (1983). The court's review of the allegations is not limited to the facts pled in the complaint against the insured. *M. Mooney Corp. v. United States Fidelity & Guar. Co., Inc.*, 136 N.H. 463, 469, 618 A.2d 793 (1992). "When the alleged facts do not clearly preclude an insurer's liability, inquiry may proceed into underlying facts." *Id.* (citing *Happy House Amusement, Inc. v. New Hampshire Ins. Co.*, 135 N.H. 719, 722–23, 609 A.2d 1231 (1992); *Moore v. New Hampshire Ins. Co.*, 122 N.H. 328, 331–33, 444 A.2d 543 (1982); *Allstate Ins. Co. v. Carr*, 119 N.H. 851, 853, 409 A.2d 782 (1979)). In such circumstances, the court looks to the facts underlying the complaint "to avoid permitting the pleading strategies ... of third party claimants to control the rights of parties to an insurance contract." *Id.* When the court interprets the policy in light of these facts, it must determine whether, on a more than casual reading of the policy, a reasonable person in the insured's position would have expected indemnity for the claims asserted against him. *Merchants Ins. Group v. Warchol*, 132 N.H. 23, 27, 560 A.2d 1162

(1989); *Karol v. New Hampshire Ins. Co.*, 120 N.H. 287, 289, 414 A.2d 939 (1980). "This is clearly an objective standard." *Merchants*, 132 N.H. at 27, 560 A.2d 1162; *Karol*, 120 N.H. at 290, 414 A.2d 939.

The court therefore begins by examining the allegations set forth in the complaints in *Mottolo I* and the language of the insurance policies to determine whether the plaintiffs' damages arose from an "occurrence" for which the defendants have a duty to indemnify the plaintiffs. The EPA complaint sets forth specific allegations of pollution in paragraphs 10 and 11.

10. Between at least 1975 and 1978 Richard Mottolo buried more than 1650 drums and other smaller containers containing wastes, including hazardous substances, in the southwest portion of the Mottolo site. These wastes were transported from K.J. Quinn and Co., Inc. and Lewis Chemical Corporation and disposed of at the Mottolo site.

11. The drums and other containers were buried in an area in the southwest portion of the site adjacent to the intermittent stream.

*See* Complaint, *United States v. Mottolo*, No. 83–547 (D.N.H.), attached as Exhibit 14, Fireman's Fund's Motion for Summary Judgment. After alleging in paragraph 10 that Mottolo had formerly used the site as a pig farm, the state complaint sets forth specific allegations of pollution in paragraphs 12 and 13.

12. Between at least 1975 and 1978, the Defendant Mottolo buried more than 1650 drums and other smaller containers containing wastes, including hazardous substances, at the Mottolo Site. These wastes were transported from Quinn and Lewis Chemical and disposed of at the Mottolo Site.

13. The drums and other containers were buried in an area in the southwest portion of the Mottolo Site adjacent to the intermittent stream.

*See* Complaint, *New Hampshire v. Mottolo*, No. 84–90 (D.N.H.), attached as Exhibit 15, Fireman's Fund's Motion for Summary Judgment. The insurance policies each de-

fine "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *See* Exhibit 19, Fireman's Fund's Motion for Summary Judgment; Exhibits, USF & G's Motions for Summary Judgment; Exhibits 3, 4, Aetna's Motion for Summary Judgment.

The court finds these allegations are insufficient to determine if there was an "occurrence" within the meaning of the policies. The allegations are not as detailed as those set forth in *Great Lakes Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30, 32–33 (1st Cir.1984). In *Great Lakes*, the government made the following allegations:

> Defendants ... operated a barrel reconditioning business on the site. On this site, there was a storage area where up to 60,000 drums are stored pending reconditioning, a plant to recondition barrels, a small office and a storage area for reconditioned barrels.

> In the course of reconditioning barrels, used barrels are emptied of all chemicals and other wastes and residues, washed and rinsed and stripped of rust by various industrial processes some of which include use of caustic solutions, physically dedented and tightened, tested, painted, and sold.

> Wastes from used drums and the reconditioning operation have been deposited and discharged on the ground of the Great Lakes Container Corporation site, and have been and are stored on the site.

> Wastes discharged and deposited on the ground have contaminated the soil, migrated toward groundwater and entered groundwater.

*Id.* at 33. The *Great Lakes* court held, without detailed explanation, that these allegations were sufficient to show "there is no 'occurrence' within the meaning of the policy...." *Id.* In the present action, by contrast, the allegations in the underlying complaints do not show the pollution "has taken place as a concomitant of [the plaintiffs'] regular business activity." *See id.* As such, the court will look beyond the complaint.

## B. Undisputed Facts

In 1964, Mottolo purchased 65 acres of land located on Blueberry Hill Road in Raymond, New Hampshire. He owned the site at all times material to this action. *Mottolo I,* 695 F.Supp. at 619, 623; June 21, 1979 Deposition of Richard A. Mottolo ("Dep. I") p. 8, lines 9–11 & 20–21; and December 16, 1983 Deposition of Richard A. Mottolo ("Dep. II") pp. 6–7, questions 28–32. Until 1974, Mottolo raised pigs, grew trees, stored some truck bodies and some lumber at this site. Dep. II, p. 12, questions 69–72, p. 14, question 79.

Sometime in 1973, Mottolo became the sole proprietor of Service when he purchased that business from Service Enterprises, Inc. *Mottolo I,* 695 F.Supp. at 619; Dep. I, p. 10, lines 1–4. Service engaged primarily in the business of cleaning drains, pumping septic tanks and cesspools, cleaning out grease traps, and digging out storm drains. *Mottolo I,* 695 F.Supp. at 619; Dep. I, p. 12, lines 16–21; Dep. II, p. 5, question 20. At the time Mottolo purchased Service, its business assets included septic tank trucks, a catch-basin truck and some roto-rooter equipment. Dep. I, p. 10, lines 14–18, 22–23. Service disposed of the wastes accumulated from its pumping and drain operations, generally sand, grease, and sewage, by taking the wastes to a contractor, if it was clean enough for reuse, or by discharging the sewage into the city sewer system through licensed spots. Dep. II, p. 13, question 78.

Service contracted to pick up and dispose of wastes generated by K.J. Quinn and Company ("Quinn") beginning in 1975, and by the Lewis Chemical Corporation ("Lewis") beginning in 1977. *Mottolo I,* 695 F.Supp. at 619; Dep. I, p. 19, lines 19–22; Dep. II, p. 12, question 73–74, p. 15, question 83, p. 18, questions 110–111. From 1975 to 1978, Mottolo picked up waste material from Quinn's Malden, Massachusetts and Seabrook, New Hampshire facilities. *Mottolo I,* 695 F.Supp. at 625; Dep. II, p. 15, questions 86–87. Mottolo or one of his employees drove the Service dump truck to loading docks at each facility, where a Quinn employee wheeled the waste containers into the truck. Dep. I, p. 42, lines 18–23, p. 43, lines 1–3. Quinn's

waste containers usually had "slop" or "waste" written on them, but sometimes they would also have two or three additional labels from prior use. Dep. I, p. 44, lines 1–2; Dep. II, p. 16, questions 92–94, p. 22, question 132. Mottolo estimated Service hauled about one load each week of waste materials from Quinn's facilities. Dep. II, p. 18, questions 108–109. The dump truck Mottolo used to make the Quinn pick-ups held 20 to 21 barrels. Dep. II, p. 18, question 104. Mottolo's agreement with Service began in 1977 when a Lewis employee called Mottolo to say Lewis had barrels of sludge needing disposal and asked Mottolo if he had a place to dispose of some barrels of sludge. Dep. II, p. 23, questions 134–36.

Mottolo estimated that during the contract periods with Quinn and Lewis, Service disposed of approximately 200 to 300 barrels of waste from Lewis and 1,200 to 1,300 barrels of waste from Quinn at the site. Dep. II, p. 26, question 156–57. After transporting the barrels to the site, Mottolo dumped them off the back of the truck and left them there until approximately ten loads had accumulated. Dep. I, p. 73, lines 15–23; Dep. II, pp. 28–29, questions 169–70. After ten loads had accumulated on the site, George Frotten, a Mottolo employee, "pushed out" the barrels with a bulldozer. Dep. I, pp. 73–75; Dep. II, pp. 28–29. In addition, Mottolo once brought two tank trucks of liquid waste from Quinn and pumped it onto the site. Dep. I, p. 53, lines 1–15. Mottolo stopped disposing wastes from Quinn and Lewis at his site sometime in 1978. Dep. I, p. 64, lines 12–15.

### C. Disputed Facts

These disputed facts are set forth in the light most favorable to the plaintiffs. Mottolo was aware Quinn manufactured shoe polish at its Malden facility and polyurethane at its Seabrook facility, but he did not attempt to ascertain the contents of the waste containers Service received from Quinn. Dep. I, p. 32, lines 4–5; Dep. II, p. 16, question 92. Mottolo indicates he was advised at the Seabrook plant that Quinn "had polyurethane which is very thick—it looks like wax." Dep. II, p. 59, questions 378. He had no notion the materials he was hauling were in fact hazardous. Dep. I, p. 104. Most of the containers Service took from Quinn were sealed. Dep. I, p. 43. However, when Mottolo occasionally replaced covers on these containers, he observed they held a thick "goopy" substance or "water slop." Dep. I, p. 43, lines 19–21, p. 45, lines 2–6. On one occasion, Service picked up a cardboard container which leaked onto the pavement at the site, emitting a "rancid" smell which Mottolo described as "super, super strong odorwise." Dep. I, p. 26, lines 19–21, p. 45, lines 2–6.

Mottolo knew Lewis ran a solvent recovery business. Dep. II, p. 61, question 389. He also knew the sludge he hauled from Lewis was material left over from Lewis's operations. Dep. II, p. 23, questions 135–38. When a Lewis official called Mottolo and advised him that they had "a lot of solvent and were looking ... to get rid of it," Dep. I, p. 55, lines 14–18, Mottolo indicated he had a dump. Dep. I, p. 55, lines 21–22, p. 56, lines 2–3. However, he did not have a permit for his dump. Dep. I, p. 56, lines 5–7. Mottolo or one of his employees drove Service's dump truck to Lewis's loading dock where the waste barrels were loaded onto the truck. Dep. I, p. 60, lines 15–21. Mottolo indicated the barrels he picked up at Lewis were always sealed, so he never saw what was inside them. Dep. II, p. 62. He also indicated he did not hear any sloshing in the barrels. July 16, 1990 Affidavit of Richard A. Mottolo ("Affidavit"), ¶ 4. Service hauled approximately one twenty-barrel load from Lewis each month. Dep. II, p. 62, question 394.

Mottolo took the containers to the site to fill in an area of rough land to make it usable. Affidavit, ¶ 5; Dep. I, pp. 24, 66. He said the site was not a commercial dump but rather the kind of dump most farms have. Affidavit, ¶ 2; Dep. I, p. 56. Mottolo did not intend to contaminate the soil as a result of filling in the site. Affidavit, ¶ 5. However, Mottolo admits he knew licensed landfills were no longer accepting the types of waste he buried at his site. Dep. I, pp. 84–86, 115–16.

To fill in the site, the barrels were "leveled off" and dirt was placed over them. Dep. I, p. 74, lines 7–16; Dep. II, p. 29, questions 175–76. During this bulldozing, barrels

would be crushed, causing them to break and spill their contents. Dep. I, p. 74, lines 11–16; Dep. II, p. 29, question 179. Mottolo knew the barrels were broken. Dep. I, p. 109, lines 17–22; Dep. II, p. 30, questions 181–82. He indicated that "[w]hen a drum broke open, you would have reds or blues, or you know. It would look like shoe polish." Dep. II, p. 60, question 381. In addition, some of the contents would "sit there and mass." Dep. I, p. 44, lines 17–21, p. 47, lines 10–13, p. 75, lines 6–8; Dep. II, p. 30, questions 181–82, p. 60, questions 381–82. Mottolo also indicated he knew that fluids spilled directly onto the soil. Dep. I, p. 109, lines 17–22; Dep. II, p. 30, questions 181–182.

### D. Interpreting "Occurrence" in the Policies

■ When a federal court sits in diversity, it must apply the substantive law of the state in which it sits. See *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *American Title Ins. Co. v. East West Fin. Corp.*, 959 F.2d 345, 348 (1st Cir.1992). The New Hampshire Supreme Court has indicated that in interpreting "occurrence" in an insurance policy, courts must focus on the definition of accident "as a *cause* of injury, as distinct from the injury itself." *Vermont Mut. Ins. Co. v. Malcolm*, 128 N.H. 521, 523, 517 A.2d 800 (1986) (emphasis added). In *Vermont Mutual*, the court defined accident as "an undesigned contingency, ... a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." *Id.* (quoting *Guerdon Indus. Inc. v. Fidelity & Casualty Co. of New York*, 371 Mich. 12, 18–19, 123 N.W.2d 143 (1963) (quoting 10 R. Anderson, *Couch Cyclopedia of Insurance Law* § 41.6, at 27–28 (2d ed. 1962))). The *Vermont Mutual* court held

> an insured's act is not an accidental contributing cause of injury when the insured actually intended to cause the injury that results. "[A]n accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen [circumstance exists or] happening occurs which produces or brings about the result of injury or death."

*Id.* 128 N.H. at 523, 517 A.2d 800 (quoting *Unigard Mut. Ins. Co. v. Spokane Sch. Dist.*, 20 Wash.App. 261, 264, 579 P.2d 1015 (1978)). The *Vermont Mutual* court also held that "an insured's intentional act [cannot] be an accidental cause of injury when it is so inherently injurious that it cannot be performed without causing the resulting injury." *Id.* 128 N.H. at 524, 517 A.2d 800. Applying this test in *Vermont Mutual* and subsequent cases, the New Hampshire Supreme Court has rejected arguments an insured's conduct was accidental where the insured sexually assaulted a child, *id.* at 524, 517 A.2d 800, where the insured wrongfully discharged an employee, *Jespersen v. United States Fidelity & Guar. Co.*, 131 N.H. 257, 261, 551 A.2d 530 (1988), and where the insured intentionally signed conflicting purchase and sale agreements for the same property. *Fisher v. Fitchburg Mut. Ins. Co.*, 131 N.H. 769, 773, 560 A.2d 630 (1989).

In the present action, it is undisputed the plaintiffs' acts were intentional. Mottolo intentionally placed barrels on his site, bulldozed them, caused their contents to spill and then covered the site with dirt. However, the plaintiffs contend they had no intention of causing the particular injury, the contamination, which resulted from Mottolo's acts. As such, the plaintiffs claim the acts constitute an "occurrence" as defined in the policies.

■ The court notes it is impractical to adhere to a general rule that it must always look to the insured's subjective intent to determine intent to injure. See *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 85–86, 629 A.2d 831 (1993).

> Although insureds may concede that pollutants—even known pollutants—had been intentionally discharged, those insureds are virtually certain to insist that the resultant harm was unintended and unexpected. Absent "smoking gun" testimony from a disgruntled employee, proof of subjective intent to cause environmental harm will rarely be available in coverage litigation.

*Id.* As the court has already indicated, however, the New Hampshire Supreme Court has recognized that proof of subjective intent to injure can be inferred in cases where an insured's acts are inherently injurious. *See Vermont Mutual,* 128 N.H. at 524, 517 A.2d 800 (insured's intentional act not an accidental cause of injury "when it is so inherently injurious that it cannot be performed without causing the resulting injury").[3] Other courts have reached identical results in other contexts. *See, e.g., Thompson v. West Am. Ins. Co.,* 839 S.W.2d 579, 581 (Ky.App.1992) ("sexual molestation is so inherently injurious, or substantially certain to result in some injury, that the intent to injure, or the expectation that injury will result, can be inferred as a matter of law."); *Worcester Ins. Co. v. Fells Acres Day Sch., Inc.,* 408 Mass. 393, 558 N.E.2d 958, 965 (1990) ("[R]eason mandates that from the very nature of the act [sexual abuse of children], harm to the injured party must have been intended."); *Atlantic Employers Ins. Co. v. Tots & Toddlers Pre-School Day Care Ctr., Inc.,* 239 N.J.Super. 276, 571 A.2d 300, 304 (1990) ("A subjective test suggests that it is possible to molest a child and not cause some kind of injury, an unacceptable conclusion. Certainly, one would and should expect some physical or psychological injury or both, to result from such acts.").

■ After reviewing these decisions, however, the court believes that "environmental-pollution litigation should generally [not] be included in that category of cases ... in which reprehensible conduct justifies a presumption that injury was intended." *Morton,* 134 N.J. at 86, 629 A.2d 831 (citation omitted).

As the numerous cases involving interpretation of the pollution-exclusion clause

demonstrate ... insureds held responsible for remediation of environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharges. A general rule in environmental-pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified.

*Id.* Instead, the court agrees with the *Morton* court that it must determine, after reviewing all the available evidence, whether exceptional circumstances exist that objectively establish the insured's intent to injure. *See id.* at 86, 629 A.2d 831.

Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.

*Id.*

■ In applying these factors in the present action, the court is of the opinion that exceptional circumstances exist that objectively establish the plaintiffs' intent to injure. First, the discharges continued over a four-year period. Second, the discharges resulted from the plaintiffs' intentional acts; they did not occur negligently or innocently. Third, Mottolo had both objective and subjective knowledge of the harmful propensities of the discharged materials. For example, Mottolo knew he was not burying barrels containing distilled water, but barrels containing waste products from manufacturing and solvent recovery businesses. He knew that licensed

---

**3.** To explain how in particular situations an insured's act, despite being intentional, could nevertheless constitute an "occurrence" for which an insurer had a duty to provide coverage, the court drew a distinction between an insured driver who negligently but nevertheless intentionally makes a right turn and injures a pedestrian who has just stepped into the insured's new line of travel, and an insured driver who sees the pedestrian stepping from the curb and proceeds to make his right turn intending to strike the pedestrian. *See Vermont Mut. Ins. Co. v. Malcolm,* 128 N.H. 521, 524–25, 517 A.2d 800 (1986). In the

former case, the driver has no intent to injure the pedestrian, nor is his making a right turn so inherently injurious that the injury was certain to follow from it. *See id.* In this situation, "the act as a contributing cause of injury would be regarded as accidental and an 'occurrence.' The basic coverage would then apply...." *Id.* at 524–25, 517 A.2d 800. However, in the latter case, the driver's "use of the automobile as a weapon was so inherently injurious that the collision would not be regarded as an 'occurrence' even if the insured did not actually intend to break any bones." *Id.* at 525, 517 A.2d 800.

landfills were not accepting these materials. When he bulldozed the barrels, he saw them break and spill their contents. He knew distilled water did not seep from these barrels; indeed, he indicated the contents were colored and would often "sit there and mass." However, it is true there is no evidence federal and state officials attempted to discourage or prevent the plaintiffs' conduct. *See id.* at 15–16, 629 A.2d 831 (for more than twenty years, regulatory officials consistently warned insured's predecessors of unacceptable levels of mercury emissions). This lack of involvement, however, is due to the fact the plaintiffs had ceased their dumping at the site before officials discovered the contamination.

In view of this analysis, the court finds the plaintiffs' acts were so inherently injurious they could not be performed without causing the resulting injury, the contamination of the site, and therefore infers the plaintiffs subjectively intended to cause the injury. In making this determination, however, the court emphasizes its conclusion rests on the exceptional circumstances in the complete record in this litigation and not on an assumption that environmental pollution cases involving intentional discharges of pollutants warrant a presumption that injury was intended. *See id.* at 86, 629 A.2d 831. In sum, the court finds the plaintiffs' damages did not arise from an "occurrence" as defined in the insurance policies and the defendants have no duty to indemnify the plaintiffs.

#### Conclusion

For the foregoing reasons, the court grants the defendants' motions for summary judgment (document nos. 45.1, 48.1, 49.1) and denies the plaintiffs' cross motion for summary judgment (document no. 52.1).

SO ORDERED.