UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1707

RICHARD A. MOTTOLO AND SERVICE
PUMPING & DRAIN CO., INC.,
Plaintiffs - Appellants,

v.

FIREMAN'S FUND INSURANCE
COMPANY, ET AL.,
Defendants - Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Torruella, Chief Judge,
Boudin, Circuit Judge,
and Barbadoro,* District Judge.

James H. Gambrill, with whom Engel, Gearreald & Gardner,
P.A. was on brief for appellants.
Kevin C. Devine, with whom Devine & Nyquist, Joseph S.
Crociata, Stuart L. Peacock, Gilberg & Kurent, Stephen Dibble and
Ouellette, Hallisey, Dibble & Tanguay, P.A. were on brief for
appellees.
Thomas W. Brunner, Laura A. Foggan, Richard H. Gordin, Lon
A. Berk, Dennis A. Tosh and Wiley, Rein & Fielding on brief for
Insurance Environmental Litigation Association, amicus curiae.

January 3, 1995



* Of the District of New Hampshire, sitting by designation.

TORRUELLA, Chief Judge. Plaintiffs-appellants, Richard TORRUELLA, Chief Judge.

Mottolo ("Mottolo") and Service Pumping and Drain Co., Inc.

("Service"), appeal the district court's summary judgment ruling

that no coverage was provided under insurance policies issued to

Mottolo by defendants-appellees, Fireman's Fund Insurance Company

("Fireman's Fund"), United States Fidelity & Guaranty Company

("USF & G") and Aetna Casualty and Surety Company ("Aetna"), for

injury to property caused by the dumping of hazardous waste by

Mottolo and Service. For the reasons set forth below, we affirm

the district court's entry of summary judgment.

I. I.

BACKGROUND BACKGROUND

On September 8, 1983, and February 4, 1984,

respectively, the United States and the State of New Hampshire

(together, "the government") brought suits in the United States

District Court for New Hampshire against Mottolo, Service, and

others, pursuant to the Comprehensive Environmental Response,

Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C.

9601-9675, amended by the Superfund Amendments and

Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613

(1986), and state law, to recover costs associated with the

cleanup of a site used by Mottolo and Service to dump hazardous

waste. The two cases were later consolidated. On August 28,

1988, the district court granted in part the government's motion

for summary judgment, finding Mottolo and Service jointly and

severally responsible for all cleanup costs incurred by the

-2-

government at the dump site. United States v.

Mottolo, 695 F. Supp. 615, 631 (D.N.H. 1988).

Mottolo and Service then brought this action in the

United States District Court for New Hampshire seeking a

declaration that the defendant insurance companies are obligated

to indemnify them for the costs of cleaning up the dump site.

Upon cross motions for summary judgment, the district court found

that because plaintiffs' damages did not arise from an

"occurrence," as defined by defendants' insurance policies,

defendants did not have a duty to indemnify the plaintiffs.

Mottolo v. Fireman's Fund Ins. Co., 830 F. Supp. 658 (D.N.H.

1993). The district court therefore granted defendants' motion

for summary judgment and denied plaintiffs' cross motion for

summary judgment. This appeal followed.

II. II.

STANDARD OF REVIEW STANDARD OF REVIEW

We review a district court's grant of summary judgment

de novo and read the record in a light most favorable to the non-

moving party, drawing all inferences in the non-moving party's

favor. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir.

1993), cert. denied, U.S. , 114 S. Ct. 1398, 128 L.Ed.2d 72

(1994). Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

-3- 3

is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). A "material" fact is one "that might affect the outcome

of the suit under the governing law." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

A dispute about a material fact is "genuine" if "the evidence is

such that a reasonable jury could return a verdict for the

nonmoving party." Id.

Essentially, Rule 56(c) mandates the entry of summary

judgment "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of

proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 325,

106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). As to issues on which

the nonmovant has the burden of proof, the movant need do no more

than aver "an absence of evidence to support the nonmoving

party's case." Id. at 325. The burden of production then shifts

to the nonmovant, who, to avoid summary judgment, must establish

the existence of at least one question of fact that is both

"genuine" and "material." See Anderson, 477 U.S. at 248. The

nonmovant, however, may not rest upon mere denial of the

pleadings. Fed. R. Civ. P. 56.

III. III.

DISCUSSION DISCUSSION

A. Duty to Indemnify A. Duty to Indemnify

Under New Hampshire law, an insurer's duty to indemnify

an insured may be determined by an analysis of the underlying

-4- 4

allegations against the insured and the express terms of the

policy. Great Lakes Container v. National Union Fire Ins., 727

F.2d 30, 32 (1st Cir. 1984) (citing Aetna Ins. Co. v. State

Motors, Inc., 109 N.H. 120, 244 A.2d 64 (1968)). If the

complaint in the underlying action does not on its face establish

lack of coverage, however, inquiry may proceed into independent

evidence. M. Mooney Corp. v. United States Fidelity & Guar. Co.,

Inc., 136 N.H. 463, 469, 618 A.2d 793 (1992). When interpreting

the policy in light of these facts, a reviewing court employs an

objective standard, inquiring whether a reasonable person in the

insured's position would have expected indemnity for the claims

asserted against him. See Merchants Ins. Group v. Warchol, 132

N.H. 23, 27, 560 A.2d 1162 (1989).

B. The "Occurrence" Policy Provision B. The "Occurrence" Policy Provision

Mottolo seeks a declaration of coverage from Fireman's

Fund, USF & G and Aetna under insurance policies which provide

coverage for claims brought against an insured because of

property damage caused by an "occurrence." The phrase

"occurrence," is defined in each policy as "an accident,

including continuous or repeated exposure to conditions, which

results in bodily injury or property damage neither expected nor

intended from the standpoint of the insured." The threshold, and

dispositive, question in this case is whether Mottolo's

contamination of property was an "accident," and therefore an

-5- 5

"occurrence" covered by the relevant insurance policies.1

The New Hampshire Supreme Court has addressed

"occurrence" policy provisions virtually identical to the one at

bar in a line of cases beginning with Vermont Mutual Ins. Co. v.

Malcolm, 128 N.H. 521, 517 A.2d 800 (1986) and ending most

recently in Providence Mutual Fire Ins. Co. v. Scanlon, 138 N.H.

301, 638 A.2d 1246 (1994) and Green Mountain Ins. Co. v. Foreman,

138 N.H. 440, 641 A.2d 230 (1994).2 In between, the Court

decided Jespersen v. U.S. Fidelity & Guaranty Co., 131 N.H. 257,

260, 551 A.2d 530 (1988) and Fisher v. Fitchburg Mut. Ins. Co.,

131 N.H. 769, 560 A.2d 630 (1989). In those cases, the Court

construed the term "accident" in the context of "occurrence"

coverage to mean "'an undesigned contingency, . . . a happening

by chance, something out of the usual course of things, unusual,

fortuitous, not anticipated, and not naturally to be expected.'"

Jespersen, 131 N.H. at 260 (quoting Vermont Mutual, 128 N.H. at

523) (other citations omitted). The Jespersen Court explained

that the question of whether the causal event was "fortuitous" is



1 Because we agree with the district court that Mottolo's
actions did not constitute an "accident," and therefore were not
an "occurrence" covered by the insurance policies, we do not
reach the question of whether the property damage was expected or
intended from the standpoint of Mottolo, although, as explained
infra, that inquiry is at least partly subsumed by our analysis
of whether the contamination was an "accident."

2 The substantive law of New Hampshire controls this litigation.
See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61
S. Ct. 1020, 85 L.Ed. 1477 (1941) (a federal court sitting in
diversity must apply the substantive law that would be applied by
the state in which it sits); American Title Ins. Co. v. East West
Fin. Corp., 959 F.2d 345, 348 (1st Cir. 1992). 

-6- 6

answered by considering not "'the character of the act viewed in

isolation, but . . . the character of the act viewed, with

reference to the insured, as a cause of injury.'" Id. (quoting

Vermont Mutual, 128 N.H. at 524).

-7- 7

In Scanlon, the New Hampshire Supreme Court reiterated

the test formulated in Vermont Mutual for determining whether

there is an accident:

"If the insured did not intend to inflict
the injury on the victim by his
intentional act, and the act was not so
inherently injurious that the injury was
certain to follow from it, the act as a
contributing cause of injury would be
regarded as accidental and an
'occurrence.'"

Scanlon, 638 A.2d at 1249 (quoting Vermont Mutual, 128 N.H. at

524). An intentional act is "inherently injurious if it is

certain to result in some injury, although not necessarily the

particular alleged injury." Id.

Mottolo's actions in dumping materials at the site

were, of course, intentional. Therefore, his actions were not

"accidental" if either 1) he intended to cause the injury or 2)

his actions were "inherently injurious." Mottolo has sworn by

affidavit that he did not intend to injure property by dumping

the waste. The question, therefore, is whether Mottolo's

intentional acts of dumping hazardous waste were so "inherently

injurious" that they could not be performed without a certainty

that some degree of injury to property would result. This is an

objective inquiry for which Mottolo's "intent" to injure is

irrelevant. See Jespersen, 131 N.H. at 261 ("Because their

intentional act was inherently injurious, it is of no consequence

that the Jespersens have sworn, without contradiction, that they

did not intend to cause the alleged injuries."); see also Fisher,

131 N.H. at 773.

-8- 8

C. Underlying Allegations C. Underlying Allegations

The United States Environmental Protection Agency

("EPA") made the following allegations of pollution in paragraphs

10 and 11 of its Complaint in the underlying action:

10. Between at least 1975 and 1978
Richard Mottolo buried more than 1650
drums and other smaller containers
containing waste, including hazardous
substances, in the southwest portion of
the Mottolo site. These wastes were
transported from K.J. Quinn and Co., Inc.
and Lewis Chemical Corporation and
disposed of at the Mottolo site.

11. The drums and other containers were
buried in an area in the southwest
portion of the site adjacent to the
intermittent stream.3

Because these allegations are by themselves

insufficient to determine whether there was an "occurrence"

within the meaning of the insurance policies -- or, more

precisely, whether Mottolo's acts were so inherently injurious

that some degree of injury to property was certain to result --

we look to the facts underlying the complaint.4

At all times relevant to this litigation, Mottolo owned

65 acres of land on Blueberry Hill Road ("the site") in Raymond,

New Hampshire. In 1973, Mottolo purchased Service, a company

whose primary business involved cleaning out drains and grease

traps, and pumping out septic tanks and cesspools. Service


3 The State of New Hampshire made essentially the same
allegations in its Complaint.

4 We review those facts in the light most favorable to Mottolo
and Service. See Nereida-Gonz lez v. Tirado-Delgado, 990 F.2d
701, 702 (1st Cir. 1993).

-9- 9

disposed of waste accumulated from these operations -- generally

sand, grease, and sewage -- by taking the waste to a contractor,

or by discharging the sewage into the city sewer system through

licensed spots. In 1975 and 1977, respectively, Service

contracted with K.J. Quinn and Company ("Quinn") and the Lewis

Chemical Corporation ("Lewis") to pick up and dispose of waste

generated by those companies. Mottolo picked up waste for Quinn

and Lewis until sometime in 1978, disposing approximately 200 to

300 barrels of waste from Lewis and 1,200 to 1,300 barrels of

waste from Quinn.

Mottolo or one of his employees drove the Service dump

truck to pick up drums and barrels of waste at Quinn's two

facilities in Malden, Massachusetts and Seabrook, New Hampshire.

Mottolo knew Quinn manufactured shoe polish at its Malden

facility and polyurethane at its Seabrook facility. Mottolo was

informed at the Seabrook plant that Quinn "had polyurethane which

is very thick -- it looks like wax." Most of the containers

usually had the words "slop" or "waste" written on them.

Although most of the drums and barrels Mottolo received from

Quinn were sealed, Mottolo occasionally had to replace covers on

the containers and observed that they held a thick "goopy"

substance or "water slop." On one occasion, Service picked up a

cardboard container from Quinn which leaked a "rancid" "super,

super strong" smelling liquid onto the pavement at the site.

Mottolo made no attempt to ascertain the contents of the waste

containers.

-10- 10

Mottolo knew Lewis ran a solvent factory and knew that

the sludge he hauled was leftover from Lewis' operations.

Mottolo's agreement with Lewis began when a Lewis official called

Mottolo and informed him that they had "a lot of solvent and were

looking . . . to get rid of it." Mottolo informed him that he

had a dump, but that he did not have a permit. They nevertheless

agreed that Mottolo would dispose of the containers. The drums

and barrels Mottolo picked up at Lewis were always sealed and he

never saw what was in them when he picked them up.

Mottolo, or one of his employees, would transport the

drums and barrels to the site on Mottolo's truck and then dump

them. After ten to fifteen loads accumulated, George Frotten, a

Mottolo employee, would bulldoze the containers in an attempt to

level off the site. Dirt was then placed over them. During the

bulldozing, barrels and drums would be crushed and flattened,

causing them to rupture and spill their contents into the soil.

Mottolo knew that the containers broke during the bulldozing and

that their contents would spill into the soil. Mottolo stated

that "[w]hen a drum broke open, you would have reds or blues. . .

. It would look like shoe polish." He stated that some of the

contents would "sit there and mass." Mottolo once brought two

tank trucks of liquid waste from Quinn and pumped their contents

directly into the dump site.

D. The District Court's Analysis D. The District Court's Analysis

In finding that Mottolo's acts were "inherently

injurious," the district court applied the "exceptional

-11- 11

circumstances" test articulated by the New Jersey Supreme Court

in Morton Int'l, Inc. v. General Accident Ins. Co., 134 N.J. 1,

629 A.2d 831 (1993), rather than New Hampshire's "objective"

test. Mottolo, 830 F. Supp. at 664. The district court

distinguished the Vermont Mutual-Scanlon line of cases, stating

that "'environmental-pollution litigation should generally [not]

be included in that category of cases . . . in which

reprehensible conduct justifies a presumption that injury was

intended.'" Id. at 664 (quoting Morton, 134 N.J. at 86).5

Applying the Morton standard, the court listed several

"exceptional circumstances" that enabled it to infer Mottolo's

subjective intent to injure. Id. at 664-65. 

The district court was bound to apply the law of New

Hampshire and erred in not doing so.6 It is perhaps plausible

that, in applying Morton, the district court was expressing its

belief that New Hampshire courts would distinguish Vermont Mutual


5 The rationale for the distinction is that "'insureds held
responsible for environmental pollution vary significantly in
their degree of culpability for the harm caused by pollutant
discharge.'" Mottolo, 830 F. Supp. at 664 (quoting Morton, 134
N.J. at 86). Therefore, "'[a] general rule in environmental-
pollution coverage litigation that would permit intent to injure
to be presumed simply on the basis of a knowing discharge of
pollutants would be unjustified.'" Id. (quoting Morton, 134 N.J.
at 86). Regardless of the merits of this proposition, there is
no basis in Vermont Mutual and its progeny for inferring that the
New Hampshire Supreme Court would adopt it. Rather, the law of
New Hampshire, as evolved from Vermont Mutual through Scanlon and
Foreman, is clear. The Court applies an objective test to
determine whether the causation of injury was an "accident" and,
therefore, an "occurrence" for insurance coverage purposes.

6 We note that the "exceptional circumstances" standard applied
by the district court was actually more favorable to Mottolo than
New Hampshire's objective, reasonable person standard.

-12- 12

and its progeny and apply the Morton standard. In any case,

however, as discussed below, we find incorrect the district

court's premise for distinguishing the New Hampshire cases --

that they relied on the "reprehensible" nature of the claimant's

conduct to justify the presumption of intent to injure.7 Once

the premise falls, so does the justification for using a standard

other than that expressly pronounced by the New Hampshire Supreme

Court.

E. Analysis E. Analysis

The proper question, under New Hampshire law, is

whether a reasonable person in Mottolo's shoes would foresee that

his dumping of waste was certain to cause some degree of injury

to property. See Fisher, 131 N.H. at 773 ("A reasonable person

would foresee that entering into two contracts to sell the same

property would inevitably lead to the breach of at least one of



7 Vermont Mutual did involve "reprehensible" conduct. See
Vermont Mutual, 128 N.H. at 521 (act of sexually assaulting young
boy inherently injurious because psychological injury certain to
result). In Fisher, however, the New Hampshire Supreme Court
held that the sellers' act of signing two purchase and sale
agreements for his home was inherently injurious because the
sellers would inevitably have to breach one of the contracts.
Fisher, 131 N.H. at 773. Even a willful breach of a contract
cannot properly be termed "reprehensible" conduct; certainly not
on par with the conduct at issue in Vermont Mutual. In
Jespersen, the Court held that the claimant's discharge of his
business partner was inherently injurious because some degree of
mental and physical distress was a natural consequence.
Jespersen, 131 N.H. at 261. The discharge of a partner, by
itself, is not "reprehensible" conduct. Moreover, the Court went
so far as to note that even a justifiable termination is
inherently injurious. Id. (emphasis added). In summary, the New
Hampshire Supreme Court has never linked its objective,
"inherently injurious" standard to the "reprehensible" nature of
any of the claimants' conduct.

-13- 13

the two contracts."). The New Hampshire Supreme Court

"determine[s] whether an injury was the result of an accident not

by considering 'the character of the act viewed in isolation, but

. . . the character of the act viewed, with reference to the

insured, as a cause of injury.'" Jespersen, 131 N.H. at 260

(emphasis added) (quoting Vermont Mutual, 128 N.H. at 524).

"[T]he Court does not look to the actor's subjective intent that

the result in question occur, but rather, the Court 'may infer

that the actor's state of mind was the same as a reasonable

person's state of mind would have been.'" King v. Prudential

Property and Cas. Ins. Co., 684 F. Supp. 347, 349 (D.N.H. 1988)

(quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and

Keeton on the Law of Torts 8, at 35-36).

Although the district court applied an incorrect legal

standard, our application of the proper legal standard leads to

the same result as that reached by the district court. Under New

Hampshire's objective standard, Mottolo's haphazard dumping,

bulldozing and burying of drums containing chemical waste would,

at first blush, appear objectively certain to result in "some

injury" to adjacent property.8 During the routine bulldozing of

the containers, they would be crushed, flattened, and punctured,

causing their contents to spill into the soil. The EPA

ultimately recovered from the site more than 1,650 drums and



8 We note that it is not necessary that it be certain that the
act cause the particular injury alleged; it is only necessary
that it was certain to cause some injury. Scanlon, 638 A.2d at
1249.

-14- 14

other smaller containers which held toxic, flammable, corrosive,

irritant and explosive materials.9 Mottolo was aware that the

containers were leaking into the soil. On one occasion, Mottolo

pumped two tanks of liquid waste directly into the soil. Because

the site is located adjacent to an intermittent stream, it was

foreseeable that whatever was being dumped would find its way

into the waters of the stream.10

Mottolo argues, however, that he did not know he was

dumping hazardous waste. The test under New Hampshire law is

whether a reasonable person under the circumstances would have

known that he was dumping harmful substances. See Jespersen, 131

N.H. at 260; Fisher, 131 N.H. at 773. The facts presented on

summary judgment, viewed most favorably to Mottolo, establish

that a reasonable person under the circumstances would have known

that he was dumping some form of hazardous substances, or, at the

least, that the substances that were injurious to the land. As

to this, there is no genuine factual dispute.

Mottolo was in the business of cleaning, among other

things, cesspools and grease traps, for approximately two years

prior to his contracting with Quinn. Mottolo disposed of waste

accumulated from those operations -- generally sand, grease, and



9 The hazardous chemicals identified by the EPA at the site
included acetone, toluene, trichlorethylene, xylene, butyl
acetate, methanol, methylene chloride, methyl methacrylate,
methyl ethyl ketone, and methyl isobutyl ketone.

10 Investigators discovered an upswelling of groundwater in
several locations between the site and a creek downhill with odor
and color consistent with those at the site.

-15- 15

sewage -- by taking the waste to a contractor, or by discharging

the sewage into the city sewer system through licensed spots.

Prior to his relationships with Quinn and Lewis, then, Mottolo

had at least some rudimentary knowledge of how the official

system for disposing of waste operated.

Mottolo knew Quinn manufactured shoe polish and

polyurethane and that Lewis operated a solvent factory. A Quinn

employee described the polyurethane it needed disposed as "very

thick -- it looks like wax." Mottolo's agreement with Lewis

began when a Lewis employee called him and said that Lewis had "a

lot of solvent and were looking . . . to get rid of it." The

Lewis employee asked Mottolo if he "had a means to get rid of

some solid stuff." Mottolo told him that he had a dump, but that

he did not have a permit. Apparently, this was sufficient for

Lewis. Lewis always paid Mottolo in cash, no invoices were used,

and Lewis never wanted any receipts. Lewis' clandestine behavior

would suggest to a reasonable business person that something was

amiss, but Mottolo made no attempt to ascertain the identity of

the waste he was hauling.

Mottolo knew that the containers were bulldozed at the

site, causing their contents to spill out the soil. He observed

drums leak and burst at the site and he knew that some of the

waste that leaked at the site consisted of a thick "goopy"

substance and a "rancid" "super, super strong" smelling liquid.

Mottolo disposed of approximately 1,650 drums and other small

containers of waste at the site over a three to four year period.

-16- 16

Based on these facts, we think there can be no genuine

dispute that a reasonable person in Mottolo's shoes, with

Mottolo's experience, would have known that he was dumping

substances that were certain to cause "some degree" of injury to

adjacent property.

-17- 17

Mottolo makes one last stand, however, arguing that

regardless of what is known today, a reasonable person in the

mid-1970s would not have believed that dumping the waste was

inherently injurious. We agree that the proper test looks to

what a reasonable person, at the time, would have known with

respect to the injurious nature of his acts. The defendant

insurance companies have provided evidence of the actual harmful

effects of the dumping on the site and nearby water supplies.

The defendants have also provided, as noted above, sufficient

evidence to establish that a reasonable person would have known

that he was dumping hazardous materials. This evidence is more

than sufficient to shift the burden to Mottolo to establish the

existence of a genuine issue of material fact concerning the

"state of the art" (or, more precisely, the state of general

knowledge) with respect to hazardous waste in the mid-1970s. See

Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2505, 91

L.Ed.2d 202 (1986).11

Such evidence might include expert affidavit testimony

that the state of scientific evidence was insufficient during the

relevant time period and that such dumping was not considered

"inherently injurious." Mottolo has presented no such evidence



11 Because the underlying action against Mottolo by the EPA and
the State of New Hampshire was initiated in federal court, the
burden shifting framework of New Hampshire's declaratory judgment
act, N.H. Rev. Stat. Ann. 491.22, does not apply. See Town of
Allenstown, et al. v. National Casualty Company, No. 94-1106,
slip op. at 8-9 (1st Cir. Sept. 30, 1994). The ultimate burden
of establishing coverage therefore remains on the plaintiff,
Mottolo.

-18- 18

and has failed to establish a genuine issue of material fact with

respect to the state of the art regarding knowledge of the

dangers of hazardous waste dumping in the 1970s. His statement

that he did not believe the substances were hazardous is

insufficient by itself to defeat the motion. See Fed. R. Civ. P.

56.

IV. IV.

CONCLUSION CONCLUSION

Although we find that the district court applied an

incorrect legal standard, we agree with its conclusion that there

is no genuine issue of material fact that the intentional dumping

of hazardous waste by the plaintiffs-appellants was not an

"occurrence" covered by the pertinent insurance policies. The

decision of the district court granting defendants-appellees'

motion for summary judgment is therefore

Affirmed.  Affirmed.

-19- 19