Richard A. **MOTTOLO** and Service Pumping & Drain Co., Inc., Plaintiffs–Appellants,

v.

**FIREMAN'S FUND INSURANCE COMPANY, et al., Defendants–Appellees.**

No. 94–1707.

United States Court of Appeals, First Circuit.

Heard Oct. 4, 1994.

Decided Jan. 3, 1995.

724

James H. Gambrill, with whom Engel, Ge-arreald & Gardner, P.A., Exeter, NH, was on brief, for appellants.

Kevin C. Devine, with whom Devine & Nyquist, Manchester, NH, Joseph S. Crocia-ta, Stuart L. Peacock, Gilberg & Kurent, Washington, DC, Stephen Dibble and Ouel-lette, Hallisey, Dibble & Tanguay, P.A., Do-ver, NH, were on brief, for appellees.

Thomas W. Brunner, Laura A. Foggan, Richard H. Gordin, Lon A. Berk, Dennis A. Tosh and Wiley, Rein & Fielding, Washing-ton, DC, on brief for Ins. Environmental Litigation Ass'n, amicus curiae.

Before TORRUELLA, Chief Judge, BOUDIN, Circuit Judge, and BARBADORO,* District Judge.

TORRUELLA, Chief Judge.

Plaintiffs-appellants, Richard Mottolo ("Mottolo") and Service Pumping and Drain Co., Inc. ("Service"), appeal the district court's summary judgment ruling that no

* Of the District of New Hampshire, sitting by designation.

coverage was provided under insurance policies issued to Mottolo by defendants-appellees, Fireman's Fund Insurance Company ("Fireman's Fund"), United States Fidelity & Guaranty Company ("USF & G") and Aetna Casualty and Surety Company ("Aetna"), for injury to property caused by the dumping of hazardous waste by Mottolo and Service. For the reasons set forth below, we affirm the district court's entry of summary judgment.

## I.

## BACKGROUND

On September 8, 1983, and February 4, 1984, respectively, the United States and the State of New Hampshire (together, "the government") brought suits in the United States District Court for New Hampshire against Mottolo, Service, and others, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675, *amended by* the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986), and state law, to recover costs associated with the cleanup of a site used by Mottolo and Service to dump hazardous waste. The two cases were later consolidated. On August 28, 1988, the district court granted in part the government's motion for summary judgment, finding Mottolo and Service jointly and severally responsible for all cleanup costs incurred by the government at the dump site. *United States v. Mottolo*, 695 F.Supp. 615, 631 (D.N.H. 1988).

Mottolo and Service then brought this action in the United States District Court for New Hampshire seeking a declaration that the defendant insurance companies are obligated to indemnify them for the costs of cleaning up the dump site. Upon cross motions for summary judgment, the district court found that because plaintiffs' damages did not arise from an "occurrence," as defined by defendants' insurance policies, defendants did not have a duty to indemnify the plaintiffs. *Mottolo v. Fireman's Fund Ins. Co.*, 830 F.Supp. 658 (D.N.H.1993). The district court therefore granted defendants' mo-

tion for summary judgment and denied plaintiffs' cross motion for summary judgment. This appeal followed.

## II.

## STANDARD OF REVIEW

■ We review a district court's grant of summary judgment *de novo* and read the record in a light most favorable to the non-moving party, drawing all inferences in the non-moving party's favor. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ Essentially, Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). As to issues on which the nonmovant has the burden of proof, the movant need do no more than aver "an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The burden of production then shifts to the nonmovant, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both "genuine" and "material." *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The nonmovant, however, may not rest upon mere denial of the pleadings. Fed.R.Civ.P. 56.

## III.

## DISCUSSION

### A. *Duty to Indemnify*

 Under New Hampshire law, an insurer's duty to indemnify an insured may be determined by an analysis of the underlying allegations against the insured and the express terms of the policy. *Great Lakes Container v. National Union Fire Ins.*, 727 F.2d 30, 32 (1st Cir.1984) (citing *Aetna Ins. Co. v. State Motors, Inc.*, 109 N.H. 120, 244 A.2d 64 (1968)). If the complaint in the underlying action does not on its face establish lack of coverage, however, inquiry may proceed into independent evidence. *M. Mooney Corp. v. United States Fidelity & Guar. Co., Inc.*, 136 N.H. 463, 469, 618 A.2d 793 (1992). When interpreting the policy in light of these facts, a reviewing court employs an objective standard, inquiring whether a reasonable person in the insured's position would have expected indemnity for the claims asserted against him. *See Merchants Ins. Group v. Warchol*, 132 N.H. 23, 27, 560 A.2d 1162 (1989).

### B. *The "Occurrence" Policy Provision*

Mottolo seeks a declaration of coverage from Fireman's Fund, USF & G and Aetna under insurance policies which provide coverage for claims brought against an insured because of property damage caused by an "occurrence." The phrase "occurrence," is defined in each policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The threshold, and dispositive, question in this case is whether Mottolo's contamination of property was an "accident," and therefore an "occurrence" covered by the relevant insurance policies.[1]

---

1. Because we agree with the district court that Mottolo's actions did not constitute an "accident," and therefore were not an "occurrence" covered by the insurance policies, we do not reach the question of whether the property damage was expected or intended from the standpoint of Mottolo, although, as explained *infra*, that inquiry is at least partly subsumed by our analysis of whether the contamination was an "accident."

The New Hampshire Supreme Court has addressed "occurrence" policy provisions virtually identical to the one at bar in a line of cases beginning with *Vermont Mutual Ins. Co. v. Malcolm*, 128 N.H. 521, 517 A.2d 800 (1986) and ending most recently in *Providence Mutual Fire Ins. Co. v. Scanlon*, 138 N.H. 301, 638 A.2d 1246 (1994) and *Green Mountain Ins. Co. v. Foreman*, 138 N.H. 440, 641 A.2d 230 (1994).[2] In between, the Court decided *Jespersen v. U.S. Fidelity & Guaranty Co.*, 131 N.H. 257, 260, 551 A.2d 530 (1988) and *Fisher v. Fitchburg Mut. Ins. Co.*, 131 N.H. 769, 560 A.2d 630 (1989). In those cases, the Court construed the term "accident" in the context of "occurrence" coverage to mean " 'an undesigned contingency, ... a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.' " *Jespersen*, 131 N.H. at 260, 551 A.2d 530 (quoting *Vermont Mutual*, 128 N.H. at 523, 517 A.2d 800) (other citations omitted). The *Jespersen* Court explained that the question of whether the causal event was "fortuitous" is answered by considering not " 'the character of the act viewed in isolation, but ... the character of the act viewed, with reference to the insured, as a cause of injury.' " *Id.* (quoting *Vermont Mutual*, 128 N.H. at 524, 517 A.2d 800).

In *Scanlon*, the New Hampshire Supreme Court reiterated the test formulated in *Vermont Mutual* for determining whether there is an accident:

> "If the insured did not intend to inflict the injury on the victim by his intentional act, and the act was not so inherently injurious that the injury was certain to follow from it, the act as a contributing cause of injury would be regarded as accidental and an 'occurrence.' "

---

2. The substantive law of New Hampshire controls this litigation. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941) (a federal court sitting in diversity must apply the substantive law that would be applied by the state in which it sits); *American Title Ins. Co. v. East West Fin. Corp.*, 959 F.2d 345, 348 (1st Cir.1992).

*Scanlon,* 638 A.2d at 1249 (quoting *Vermont Mutual,* 128 N.H. at 524, 517 A.2d 800). An intentional act is "inherently injurious if it is certain to result in some injury, although not necessarily the particular alleged injury." *Id.*

■ Mottolo's actions in dumping materials at the site were, of course, intentional. Therefore, his actions were not "accidental" if either 1) he intended to cause the injury or 2) his actions were "inherently injurious." Mottolo has sworn by affidavit that he did not intend to injure property by dumping the waste. The question, therefore, is whether Mottolo's intentional acts of dumping hazardous waste were so "inherently injurious" that they could not be performed without a certainty that some degree of injury to property would result. This is an objective inquiry for which Mottolo's "intent" to injure is irrelevant. *See Jespersen,* 131 N.H. at 261, 551 A.2d 530 ("Because their intentional act was inherently injurious, it is of no consequence that the Jespersens have sworn, without contradiction, that they did not intend to cause the alleged injuries."); *see also Fisher,* 131 N.H. at 773, 560 A.2d 630.

### C. *Underlying Allegations*

The United States Environmental Protection Agency ("EPA") made the following allegations of pollution in paragraphs 10 and 11 of its Complaint in the underlying action:

10. Between at least 1975 and 1978 Richard Mottolo buried more than 1650 drums and other smaller containers containing waste, including hazardous substances, in the southwest portion of the Mottolo site. These wastes were transported from K.J. Quinn and Co., Inc. and Lewis Chemical Corporation and disposed of at the Mottolo site.

11. The drums and other containers were buried in an area in the southwest portion of the site adjacent to the intermittent stream.[3]

Because these allegations are by themselves insufficient to determine whether there was an "occurrence" within the meaning of the insurance policies—or, more precisely, whether Mottolo's acts were so inherently injurious that some degree of injury to property was certain to result—we look to the facts underlying the complaint.[4]

At all times relevant to this litigation, Mottolo owned 65 acres of land on Blueberry Hill Road ("the site") in Raymond, New Hampshire. In 1973, Mottolo purchased Service, a company whose primary business involved cleaning out drains and grease traps, and pumping out septic tanks and cesspools. Service disposed of waste accumulated from these operations—generally sand, grease, and sewage—by taking the waste to a contractor, or by discharging the sewage into the city sewer system through licensed spots. In 1975 and 1977, respectively, Service contracted with K.J. Quinn and Company ("Quinn") and the Lewis Chemical Corporation ("Lewis") to pick up and dispose of waste generated by those companies. Mottolo picked up waste for Quinn and Lewis until sometime in 1978, disposing approximately 200 to 300 barrels of waste from Lewis and 1,200 to 1,300 barrels of waste from Quinn.

Mottolo or one of his employees drove the Service dump truck to pick up drums and barrels of waste at Quinn's two facilities in Malden, Massachusetts and Seabrook, New Hampshire. Mottolo knew Quinn manufactured shoe polish at its Malden facility and polyurethane at its Seabrook facility. Mottolo was informed at the Seabrook plant that Quinn "had polyurethane which is very thick—it looks like wax." Most of the containers usually had the words "slop" or "waste" written on them. Although most of the drums and barrels Mottolo received from Quinn were sealed, Mottolo occasionally had to replace covers on the containers and observed that they held a thick "goopy" substance or "water slop." On one occasion, Service picked up a cardboard container from Quinn which leaked a "rancid" "super, super strong" smelling liquid onto the pavement at the site. Mottolo made no attempt

---

3. The State of New Hampshire made essentially the same allegations in its Complaint.

4. We review those facts in the light most favorable to Mottolo and Service. *See Nereida–González v. Tirado–Delgado,* 990 F.2d 701, 702 (1st Cir.1993).

to ascertain the contents of the waste containers.

Mottolo knew Lewis ran a solvent factory and knew that the sludge he hauled was leftover from Lewis' operations. Mottolo's agreement with Lewis began when a Lewis official called Mottolo and informed him that they had "a lot of solvent and were looking ... to get rid of it." Mottolo informed him that he had a dump, but that he did not have a permit. They nevertheless agreed that Mottolo would dispose of the containers. The drums and barrels Mottolo picked up at Lewis were always sealed and he never saw what was in them when he picked them up.

Mottolo, or one of his employees, would transport the drums and barrels to the site on Mottolo's truck and then dump them. After ten to fifteen loads accumulated, George Frotten, a Mottolo employee, would bulldoze the containers in an attempt to level off the site. Dirt was then placed over them. During the bulldozing, barrels and drums would be crushed and flattened, causing them to rupture and spill their contents into the soil. Mottolo knew that the containers broke during the bulldozing and that their contents would spill into the soil. Mottolo stated that "[w]hen a drum broke open, you would have reds or blues.... It would look like shoe polish." He stated that some of the contents would "sit there and mass." Mottolo once brought two tank trucks of liquid waste from Quinn and pumped their contents directly into the dump site.

5. The rationale for the distinction is that " 'insureds held responsible for environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharge.' " *Mottolo*, 830 F.Supp. at 664 (quoting *Morton*, 134 N.J. at 86, 629 A.2d 831). Therefore, " '[a] general rule in environmental-pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified.' " *Id.* (quoting *Morton*, 134 N.J. at 86, 629 A.2d 831). Regardless of the merits of this proposition, there is no basis in *Vermont Mutual* and its progeny for inferring that the New Hampshire Supreme Court would adopt it. Rather, the law of New Hampshire, as evolved from *Vermont Mutual* through *Scanlon* and *Foreman*, is clear. The Court applies an objective test to determine whether the causation of injury was an "accident" and, therefore, an "occurrence" for insurance coverage purposes.

### D. *The District Court's Analysis*

■ In finding that Mottolo's acts were "inherently injurious," the district court applied the "exceptional circumstances" test articulated by the New Jersey Supreme Court in *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993), rather than New Hampshire's "objective" test. *Mottolo*, 830 F.Supp. at 664. The district court distinguished the *Vermont Mutual–Scanlon* line of cases, stating that " 'environmental-pollution litigation should generally [not] be included in that category of cases ... in which reprehensible conduct justifies a presumption that injury was intended.' " *Id.* at 664 (quoting *Morton*, 134 N.J. at 86, 629 A.2d 831).[5] Applying the *Morton* standard, the court listed several "exceptional circumstances" that enabled it to infer Mottolo's subjective intent to injure. *Id.* at 664–65.

The district court was bound to apply the law of New Hampshire and erred in not doing so.[6] It is perhaps plausible that, in applying *Morton*, the district court was expressing its belief that New Hampshire courts would distinguish *Vermont Mutual* and its progeny and apply the *Morton* standard. In any case, however, as discussed below, we find incorrect the district court's premise for distinguishing the New Hampshire cases—that they relied on the "reprehensible" nature of the claimant's conduct to justify the presumption of intent to injure.[7]

6. We note that the "exceptional circumstances" standard applied by the district court was actually more favorable to Mottolo than New Hampshire's objective, reasonable person standard.

7. *Vermont Mutual* did involve "reprehensible" conduct. See *Vermont Mutual*, 128 N.H. at 521, 517 A.2d 800 (act of sexually assaulting young boy inherently injurious because psychological injury certain to result). In *Fisher*, however, the New Hampshire Supreme Court held that the sellers' act of signing two purchase and sale agreements for his home was inherently injurious because the sellers would inevitably have to breach one of the contracts. *Fisher*, 131 N.H. at 773, 560 A.2d 630. Even a willful breach of a contract cannot properly be termed "reprehensible" conduct; certainly not on par with the conduct at issue in *Vermont Mutual*. In *Jespersen*, the Court held that the claimant's discharge of his business partner was inherently injurious be-

Once the premise falls, so does the justification for using a standard other than that expressly pronounced by the New Hampshire Supreme Court.

### E. *Analysis*

█ The proper question, under New Hampshire law, is whether a reasonable person in Mottolo's shoes would foresee that his dumping of waste was certain to cause some degree of injury to property. *See Fisher*, 131 N.H. at 773, 560 A.2d 630 ("A reasonable person would foresee that entering into two contracts to sell the same property would inevitably lead to the breach of at least one of the two contracts."). The New Hampshire Supreme Court "determine[s] whether an injury was the result of an accident not by considering 'the character of the act viewed in isolation, but ... the character of the act viewed, *with reference to the insured*, as a cause of injury.'" *Jespersen*, 131 N.H. at 260, 551 A.2d 530 (emphasis added) (quoting *Vermont Mutual*, 128 N.H. at 524, 517 A.2d 800). "[T]he Court does not look to the actor's subjective intent that the result in question occur, but rather, the Court 'may infer that the actor's state of mind was the same as a reasonable person's state of mind would have been.'" *King v. Prudential Property and Cas. Ins. Co.*, 684 F.Supp. 347, 349 (D.N.H.1988) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts* § 8, at 35–36).

Although the district court applied an incorrect legal standard, our application of the proper legal standard leads to the same result as that reached by the district court. Under New Hampshire's objective standard, Mottolo's haphazard dumping, bulldozing and burying of drums containing chemical waste would, at first blush, appear objectively certain to result in "some injury" to adjacent property.[8] During the routine bulldozing of the containers, they would be crushed, flattened, and punctured, causing their contents to spill into the soil. The EPA ultimately recovered from the site more than 1,650 drums and other smaller containers which held toxic, flammable, corrosive, irritant and explosive materials.[9] Mottolo was aware that the containers were leaking into the soil. On one occasion, Mottolo pumped two tanks of liquid waste directly into the soil. Because the site is located adjacent to an intermittent stream, it was foreseeable that whatever was being dumped would find its way into the waters of the stream.[10]

Mottolo argues, however, that he did not know he was dumping hazardous waste. The test under New Hampshire law is whether a reasonable person under the circumstances would have known that he was dumping harmful substances. *See Jespersen*, 131 N.H. at 260, 551 A.2d 530; *Fisher*, 131 N.H. at 773, 560 A.2d 630. The facts presented on summary judgment, viewed most favorably to Mottolo, establish that a reasonable person under the circumstances would have known that he was dumping some form of hazardous substances, or, at the least, that the substances that were injurious to the land. As to this, there is no genuine factual dispute.

Mottolo was in the business of cleaning, among other things, cesspools and grease traps, for approximately two years prior to his contracting with Quinn. Mottolo disposed of waste accumulated from those operations—generally sand, grease, and sewage—by taking the waste to a contractor, or

---

cause some degree of mental and physical distress was a natural consequence. *Jespersen*, 131 N.H. at 261, 551 A.2d 530. The discharge of a partner, by itself, is not "reprehensible" conduct. Moreover, the Court went so far as to note that even a *justifiable* termination is inherently injurious. *Id.* (emphasis added). In summary, the New Hampshire Supreme Court has never linked its objective, "inherently injurious" standard to the "reprehensible" nature of any of the claimants' conduct.

8. We note that it is not necessary that it be certain that the act cause the particular injury alleged; it is only necessary that it was certain to cause *some* injury. *Scanlon*, 638 A.2d at 1249.

9. The hazardous chemicals identified by the EPA at the site included acetone, toluene, trichlorethylene, xylene, butyl acetate, methanol, methylene chloride, methyl methacrylate, methyl ethyl ketone, and methyl isobutyl ketone.

10. Investigators discovered an upswelling of groundwater in several locations between the site and a creek downhill with odor and color consistent with those at the site.

by discharging the sewage into the city sewer system through licensed spots. Prior to his relationships with Quinn and Lewis, then, Mottolo had at least some rudimentary knowledge of how the official system for disposing of waste operated.

Mottolo knew Quinn manufactured shoe polish and polyurethane and that Lewis operated a solvent factory. A Quinn employee described the polyurethane it needed disposed as "very thick—it looks like wax." Mottolo's agreement with Lewis began when a Lewis employee called him and said that Lewis had "a lot of solvent and were looking ... to get rid of it." The Lewis employee asked Mottolo if he "had a means to get rid of some solid stuff." Mottolo told him that he had a dump, but that he did not have a permit. Apparently, this was sufficient for Lewis. Lewis always paid Mottolo in cash, no invoices were used, and Lewis never wanted any receipts. Lewis' clandestine behavior would suggest to a reasonable business person that something was amiss, but Mottolo made no attempt to ascertain the identity of the waste he was hauling.

Mottolo knew that the containers were bulldozed at the site, causing their contents to spill out the soil. He observed drums leak and burst at the site and he knew that some of the waste that leaked at the site consisted of a thick "goopy" substance and a "rancid" "super, super strong" smelling liquid. Mottolo disposed of approximately 1,650 drums and other small containers of waste at the site over a three to four year period.

Based on these facts, we think there can be no genuine dispute that a reasonable person in Mottolo's shoes, with Mottolo's experience, would have known that he was dumping substances that were certain to cause "some degree" of injury to adjacent property.

Mottolo makes one last stand, however, arguing that regardless of what is known today, a reasonable person in the mid–1970s would not have believed that dumping the waste was inherently injurious. We agree

that the proper test looks to what a reasonable person, at the time, would have known with respect to the injurious nature of his acts. The defendant insurance companies have provided evidence of the actual harmful effects of the dumping on the site and nearby water supplies. The defendants have also provided, as noted above, sufficient evidence to establish that a reasonable person would have known that he was dumping hazardous materials. This evidence is more than sufficient to shift the burden to Mottolo to establish the existence of a genuine issue of material fact concerning the "state of the art" (or, more precisely, the state of general knowledge) with respect to hazardous waste in the mid–1970s. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[11]

Such evidence might include expert affidavit testimony that the state of scientific evidence was insufficient during the relevant time period and that such dumping was not considered "inherently injurious." Mottolo has presented no such evidence and has failed to establish a genuine issue of material fact with respect to the state of the art regarding knowledge of the dangers of hazardous waste dumping in the 1970s. His statement that he did not believe the substances were hazardous is insufficient by itself to defeat the motion. *See* Fed.R.Civ.P. 56.

## IV.

## CONCLUSION

Although we find that the district court applied an incorrect legal standard, we agree with its conclusion that there is no genuine issue of material fact that the intentional dumping of hazardous waste by the plaintiffs-appellants was not an "occurrence" covered by the pertinent insurance policies. The decision of the district court granting defen-

---

11. Because the underlying action against Mottolo by the EPA and the State of New Hampshire was initiated in federal court, the burden shifting framework of New Hampshire's declaratory judgment act, N.H.Rev.Stat.Ann. § 491.22, does not apply. *See Town of Allenstown, et al. v. National Casualty Company*, 36 F.3d 229, 232 (1st Cir.1994). The ultimate burden of establishing coverage therefore remains on the plaintiff, Mottolo.

dants-appellees' motion for summary judgment is therefore

*Affirmed.*