Metropolitan Ins v. Daigle                    CV-96-293-SD  03/27/97


                UNITED STATES DISTRICT COURT FOR THE

                     DISTRICT OF NEW HAMPSHIRE


Metropolitan Property & Casualty
 Insurance Company;
Allstate Insurance Company


        v.                              Civil No. 96-293-SD

Richard Daigle;
Irene Palmer;
Donald Palmer;
David Smith


                            **O R D E R**


        In this action for declaratory judgment, Allstate Insurance

Company and Metropolitan Property and Casualty Insurance Company

seek declaration that they have no obligation under their

insurance contracts to indemnify and defend their respective

insureds, David Smith and Richard Daigle, for threatened legal

liability in a civil action brought by Irene Palmer.  Palmer

instituted civil action against Smith and Daigle alleging

numerous egregious acts committed against her over a year's time.

Presently before this court are Allstate's and Metropolitan's

motions for summary judgment claiming no obligation, as a matter

of law, to indemnify and defend Smith and Daigle.  Objections

have been submittd by Smith, Daigle, and the Palmers.

<u>Background</u>

In March of 1994, when David Smith was first hired as the administrator of the Pheasant Wood Nursing Home (the Home), he placed a telephone call to B. Irene Palmer, a veteran employee of seventeen years. After identifying himself, he breathed heavily into the telephone. Complaint ¶ 21. When later confronted by Palmer, he informed her that he "just wanted to give an old lady a thrill." <u>Id.</u>

At a business meeting held at the corporate office of Sowerby Healthcare, Inc., the next month, an employee (apparently of the Home) displayed on the overhead projector a photograph of Palmer holding a "vegetable penis." <u>Id.</u> ¶ 23. The photograph had been taken at a December 1993 Christmas party for the Home at which Palmer had been given a shoe box containing the item, which consisted of a vegetable shaped like a penis that had been decorated with whipped cream on one end and a hair net on the other. <u>Id.</u> ¶ 17. Dwight Sowerby, owner of Sowerby Healthcare, laughed at the picture and did not try to stop the display. <u>Id.</u> ¶ 24.

When Palmer returned to the Home, Smith asked her if anything "unusual" had occurred at the meeting, and she replied

in the negative.  Id. ¶ 26.  He then responded that he was going to post a blow-up of the photograph on his office wall, which he in fact later did.  Id. ¶¶ 27, 28.  Smith also showed the picture, mounted on the back of a piece of carpet, to other individuals at the Home.  Id. ¶ 29.  In addition, in June of 1994 Palmer witnessed Smith showing a volunteer the photograph and remarking, "Now we know what her mouth is full of."  Id. ¶ 34.

Palmer asked Smith on numerous occasions to destroy the photograph.  He refused, telling her that he would continue showing it to staff members.  Id. ¶ 30.  Furthermore, the senior administrator told Smith to get rid of the photograph, but he did not comply.  Id. ¶¶ 32, 33.

On March 31, 1995, Smith paged Palmer over the intercom and asked that she come to his office.  Id. ¶ 35.  When Palmer arrived, Richard Daigle, a bailiff from the Jaffrey-Peterborough District Court, and Bruce McCall, a Peterborough police officer, were present.  Id. ¶ 37.  Palmer knew that Daigle's mother-in-law was a resident of the Home, and assumed there was a billing problem.  Id. ¶ 38.  Daigle, with his gun and badge showing, moved toward Palmer and said, "I hate to do this but it is my job.  I have to take you out of here in handcuffs.  I have been ordered by the Court to take you downtown."  Id. ¶ 39.  When Palmer asked Smith what was happening, he replied that he did not know.  Id. ¶ 40.  Daigle said it had something to do with

3

Medicaid fraud.  Id.

Daigle escorted Palmer and Smith to the front desk of the Home, where he handcuffed Palmer to Smith.  Id. ¶ 41.  Palmer was then taken by Daigle out the front door, past McCall, who was standing at the door in an "authoritative" stance, to a police cruiser.  Id. ¶ 42.  As Palmer was about to be placed in the car by Daigle, other employees of the Home snapped photographs.  Id. ¶ 43.  Smith then informed Palmer that the whole incident had been a "joke".  Id. ¶ 44.

After the arrest incident, Palmer continued to come to work, but she complained about the actions of those involved.  Id. ¶ 47.  Smith told her, "What goes around . . . comes around.  If you go to see the Police Chief, trouble could be made for you."  Id.  Palmer resigned on June 30, 1995.  Id. ¶ 48.

Discussion

Both Smith and Daigle seek indemnification from their respective insurance companies, Allstate and Metropolitan, under policy coverage for personal legal liability.  Both insurance contracts used similar language to define the scope of coverage.  Allstate's policy provides: "Allstate will pay damages which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an accident . . . ."  Exhibit C at 23 (attached to Allstate's motion for summary

4

judgment).  Metropolitan's policy likewise reads: "We will pay all sums for bodily injury and property damage to others for which the law holds you responsible because of an occurrence." Exhibit B at 16 (attached to Metropolitan's motion for summary judgment).  Metropolitan's policy defines "occurrence" as "an accident . . . resulting in bodily injury or property damage." Id.

Both Allstate and Metropolitan argue that any legal liability for Palmer's injuries imposed on Smith and Daigle was not the result of an "accident" and is therefore not covered under the terms of the insurance policies.  Both policies contain explicit exclusions for liability from nonaccidents.  Allstate's policy reads: "We do not cover bodily injury or property damage resulting from: a) an act or omission intended or expected to cause bodily injury or property damage. . . ."  Allstate's Exhibit C at 23.  Metropolitan's analogous provision reads: "We do not cover bodily injury or property damage which is reasonably expected or intended by you or which is the result of your intentional or criminal acts."  Metropolitan's Exhibit B at 17. The insurance companies argue that Palmer's injuries resulted from Smith's and Daigle's intentional acts and are therefore not covered accidents under the terms of the policy.

The New Hampshire Supreme Court has "construed the term 'accident' in the context of 'occurrence' coverage to mean an

5

'"undesigned contingency, . . . a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected."'" Mottolo v. Fireman's Fund Ins. Co., 43 F.3d 723, 726 (1st Cir. 1995) (quoting Jespersen v. U.S. Fidelity Guar. Co., 131 N.H. 257, 260 (1988) (quoting Vermont Mutual Ins. Co. v. Malcolm, 128 N.H. 521, 523 (1986))). In Malcolm, the New Hampshire Supreme Court announced the test for determining whether there is an accident:

> If the insured did not intend to inflict the injury on the victim by his intentional act, and the act was not so inherently injurious that the injury was certain to follow from it, the act as a contributing cause of injury would be regarded as accidental and an "occurrence."

Malcolm, supra, 128 N.H. at 524. Under the Malcolm test, there are two categories of acts that are "nonaccidental" and excluded from coverage: (1) those that are intended by the insured to cause injury and (2) those that are "inherently injurious."

According to the New Hampshire Supreme Court, an act is "inherently injurious" if "certain to result in some injury." Providence Mut. Fire Ins. Co. v. Scanlon, 138 N.H. 301, 306 (1994). However, the term "injury" has gone undefined in the caselaw. The RESTATEMENT (SECOND) OF TORTS § 7 cmt. a (1965) offers the following definition: "The word 'injury' is used . . . to denote the fact that there has been an invasion of a legally protected interest which, if it were the legal consequence of a

6

tortious act, would entitle the person suffering the invasion to maintain an action in tort."  Injury is contrasted with harm, which "denote[s] the existence of loss or detriment in fact of any kind . . . ."  Id. at § 7(2).  The concept of harm, or loss in fact, is not necessarily conterminous with injury, or invasion of a legally protected interest.  It is a fundamental axiom of tort law that *damnum absque injuria*, or damage without injury, is not legally redressable.  Just as harm may be inflicted without resulting in injury, so too "there may be an injury although no harm is done."  RESTATEMENT, supra, at 13.  For instance, the intrusion upon another's land is injurious and an invasion of the owner's legally protected interests even though not one blade of grass on the property is harmed.

In light of the distinction between injury and harm, Smith's and Daigle's conduct was "inherently injurious" if it was certain to invade Palmer's legally protected interests.  First, discussion will focus on Smith's and Daigle's conduct of staging Palmer's arrest as a "practical joke."  Next, discussion will turn to Smith's course of conduct leading up to the staged arrest.

Smith's and Daigle's conduct in executing the March 31 staged arrest of Palmer was "inherently injurious."  Arresting Palmer, even as a practical joke, was certain to invade her legally protected interests.  State tort law of false

7

imprisonment protects a personal interest in freedom from restraint. The practical joke, as planned and executed, called for Daigle to handcuff Palmer, take her into custody, and escort her out of the nursing home to the waiting police cruiser. Invasion of Palmer's legally protected interest in freedom from restraint was the certain and inevitable result.

Smith and Daigle argue that it was possible that Palmer, upon being informed that the arrest was a practical joke, would have found it amusing. However, Palmer's post-confinement reaction would not alter the initial fact of confinement, which is a sufficient condition of legal injury, regardless of whether Palmer subsequently found it amusing. Smith and Daigle confined Palmer by handcuffing her and taking her into custody, and their conduct was certain to cause legal injury by invasion of her interest in freedom from unwanted restraint.

For that reason, the March 31 staged arrest was inherently injurious, and the resulting injuries to Palmer fall outside policy coverage under the insurance contract between Metropolitan and defendant Daigle and the contract between Allstate and defendant Smith. Metropolitan, as Daigle's insurance company, is entitled to summary judgment on all counts, and has no obligations under the insurance contract to indemnify or defend Daigle. Allstate, likewise, has no obligation to indemnify and defend Smith for any liability imposed upon him as a result of

8

the March 31 arrest incident.  However, Smith is also charged with conduct that occurred prior to the March 31 arrest incident, and discussion will now turn to whether that conduct is a covered accident under the terms of Allstate's insurance policy.

Smith's course of conduct prior to the March 31 staged arrest incident was not certain to invade Palmer's legally protected interests, and therefore was not inherently injurious. Palmer complains that Smith displayed the "penis photo" taken of her at the Christmas party to other staff members at the nursing home and that he breathed heavily over the phone to her. Granted, Palmer was certain to suffer some degree of emotional distress as a result of this conduct.  However, this only supports the conclusion that Smith's conduct was certain to cause Palmer harm, not injury.  Tort law only provides protection against *severe* emotional distress.  W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 12, at 60 (1984).  Under the circumstances, Smith's conduct was not certain to cause Palmer severe emotional distress.

In fact, the evidence indicates that Palmer was likely to take Smith's conduct in good humor.  Uncontroverted evidence indicates that Palmer actually posed for the photo that she is charging Smith for displaying.  Affidavit of Mary Lilly, Defendant's Exhibit C (attached to David Smith's Objection to Allstate's Motion for Summary Judgment).  According to

9

uncontroverted evidence, Palmer displayed the photo to others with an attitude of levity.  Id.  One of Palmer's co-workers notes: "Ms. Palmer had a well known reputation for playing practical jokes of a rather course nature and seemed to have an appreciation for this type of humor."  Id.  On one occasion, Palmer presented one of her co-workers with a chocolate penis, stating, "Once you go black, you never go back."  Affidavit of Patricia Parks, Exhibit D (attached to Smith's Objection to Allstate's Motion for Summary Judgment); Affidavit of Jennifer Arsenault, Exhibit E (attached to Smith's Objection to Allstate's Motion for Summary Judgment).  Smith was familiar with this side of Palmer's persona.  He swears by affidavit,

> During the time I knew and worked with Irene Palmer, she told me that she had participated in redecorating the office of Lillian Watkins by placing condoms and explicit photographs cut from Playgirl magazine in Lillian's desk drawers.
> I have personally observed a watering can with a spout shaped like a penis in Palmer's office.
> I have personally observed a pencil eraser shaped like a penis in Irene Palmer's office.

Affidavit of David Smith, Exhibit B at 2-3 (attached to David Smith's Objection to Allstate's Motion for Summary Judgment).

While Smith's conduct may have been certain to cause severe emotional distress to one with different sensibilities than Palmer's, there was a distinct possibility that Palmer would receive Smith's conduct in good humor.  Smith's conduct was not, therefore, inherently injurious.

10

Under the Malcolm test, Palmer's injuries were accidental and within coverage of Allstate's policy, unless Smith intended to injure Palmer by his conduct. "Under New Hampshire law, the court determines an insurer's duty to indemnify the insured by considering whether the allegations against the insured fall within the express terms of the policy." Litteer v. Utica Mut. Ins. Co., 898 F. Supp. 35, 37 (D.N.H. 1995). The Palmers' complaint does not clarify whether Smith acted with the state of mind of intent to invade her legally protected interests. However, some of the intentional torts alleged in the complaint, by definition, imply such an intention. Count IV's intentional infliction of emotional distress, by definition, alleges conduct that was intended to invade Palmer's legally protected interest in freedom from severe emotional distress. One of the prima facie elements of the tort is an intent to cause severe emotional distress. Likewise, Count IX's battery claim is untenable unless Smith intended to cause Palmer to suffer harmful or offensive contact. The RESTATEMENT defines the element of intent as follows: "An actor is subject to liability to another for battery if . . . he acts intending to cause a harmful or offensive contact with the person of the other." RESTATEMENT, supra, § 13(a). Insureds will not be heard to claim that a battery or an intentional infliction of emotional distress was accidental.

The other counts in the Palmers' complaint do not likewise

11

allege by necessary implication conduct that was intended to invade Irene Palmer's legally protected interests. The tort of defamation alleged in Count VI protects an interest in reputation and good name. However, the only intent requirement for this tort is the intention to publish the statement that is adjudged defamatory. The publisher defendant may be liable, even though he was without the intent to defame or otherwise invade the plaintiff's interest in reputation and good name. For instance, the publisher may have made a statement that was innocuous on its face, but by virtue of extrinsic facts unknown to the publisher, the statement actually carries a defamatory meaning. Count VI defamation does not by necessary implication allege conduct that was intended to invade Palmer's legally protected interests. Since the factual allegations do not clarify whether Smith intended to defame Palmer, there is insufficient evidence for the court to rule on whether the Count VI defamation claim is within the scope of insurance coverage. It is therefore a jury question whether Palmer's injuries attributable to the alleged defamation were accidental or were the product of conduct intended to invade her interests.

Count V for negligent infliction of emotional distress on its face alleges conduct that was not intended to invade Palmer's interests. Allstate argues, however, that this case is controlled by Green Mt. Ins. Co. v. Foreman, 138 N.H. 440 (1994).

12

In <u>Foreman</u>, the New Hampshire Supreme Court held that a plaintiff's negligence count failed to allege facts constituting an accident. It was undisputed that the plaintiff's injuries were caused by an intentional punch in the face. The plaintiff was merely attempting to recharacterize the defendant's intentional act of punching as negligence in order to bring his injuries within the scope of the defendant's insurance policy. Courts "must compare the policy language with the facts pled in the underlying suit to see if the claim falls within the express terms of the policy; the legal nomenclature the plaintiff uses to frame the suit is relatively unimportant." <u>Titan Holdings Syndicate, Inc. v. City of Keene</u>, 898 F.2d 265, 271 (1st Cir. 1990) (<u>citing United States Fidelity & Guar. Co. v. Johnson Shoes, Inc.</u>, 123 N.H. 148, 151-152 (1983)).

Allstate argues that here Palmer's complaint does not distinguish which of Smith's acts constitute negligent infliction of emotional distress (Count V) and which constitute intentional infliction of emotional distress (Count IV). According to Allstate, this is a raw legal conclusion of negligence, and under <u>Foreman</u> this claim is not an accident within policy coverage.

However, this court finds that this case is not controlled by <u>Foreman</u>. In that case, the acts alleged were indisputably intentional, and the plaintiff was merely recharacterizing them as negligent. Here, the allegation could support either the

13

finding that Smith acted intentionally or the finding that he acted negligently. It is unclear whether Smith intended to cause Palmer severe emotional distress or merely disregarded a forseeable risk of causing severe distress. Given such uncertainty, Palmer's alternative pleading was not an attempt to recharacterize an indisputably intentional act as negligent. Rather, Palmer characterized Smith's acts as intentional and negligent, leaving it to the jury to determine which characterization is more appropriate.

Since the facts alleged in Count V may be construed as an "accident," Allstate's motion for summary judgment is denied as to Count V.

Lastly, Allstate claims entitlement to summary judgment for Donald Palmer's loss of consortium claim (Count XVII). However, there is no indication that Smith intended to injure Mr. Palmer by depriving him of his right to the services, society, and comfort of his wife, Irene Palmer. Even if Smith intended to injure Irene Palmer, the injury to Donald Palmer was an accidental by-product.

## Conclusion

Metropolitan's motion for summary judgment (document 6) is granted in its entirety. Allstate's motion for summary judgment

(document 18) is granted as to Counts IV and IX, but denied as to Counts V, VI, and XVII.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

March 27, 1997

cc:    Gary M. Burt, Esq.
       Doreen F. Connor, Esq.
       Brackett L. Scheffy, Esq.
       Kevin E. Buchholz, Esq.
       Roy A. Duddy, Esq.