Filion v. Bellows Falls Foods          CV-93-641-SD  06/01/95

UNITED STATES DISTRICT COURT FOR THE

                         DISTRICT OF NEW HAMPSHIRE


<u>Jarrod Filion</u>


       v.                                    Civil No. 93-641-SD


<u>Bellows Falls Foods, Inc.;</u>
<u>Earl Buffum; Julia Buffum;</u>
<u>Frank Fairbanks, Gary Brochey;</u>
<u>Shane Clayton; Sgt. Harry Kulp;</u>
<u>Patrolman Nelson S. Fontaine, Jr.;</u>
<u>Town of Bellows Falls, Vermont</u>


                           O R D E R


       In this civil rights action, plaintiff Jarrod Filion asserts

claims for violations of his Fourth and Fourteenth Amendment

rights under 42 U.S.C. § 1983 (Counts I and II); conspiracy to

deprive him of his constitutional rights (Count III); assault and

battery (Count IV); and false arrest and wrongful detention

(Count V).  Plaintiff's claims arise out of an incident that

occurred on October 10, 1993, during which plaintiff was accused

of retail theft by employees of defendant Bellows Falls Foods,

Inc., d/b/a Buffum's Supermarket (Buffum's).  The other

defendants named in the complaint are Earl and Julia Buffum, the

owners and operators of Buffum's; Frank Fairbanks, Gary Brochey,

and Shane Clayton, the Buffum's employees involved in the

incident;[1] Nelson F. Fontaine, Jr., and Harry Kulp, the Bellows Falls police officers involved in the incident; and the Town of Bellows Falls, Vermont.[2]

Presently before the court are: (1) a motion for summary judgment on Counts I, III, and IV filed by the Bellows Falls defendants; (2) a motion for summary judgment on Counts II, III, IV, and V filed by the Buffum defendants; (3) plaintiff's motion for summary judgment as to defendants' statutory justification defense; and (4) the Buffum defendants' motion for judgment on the pleadings as to Count II.  Objections to each motion have been filed by the relevant parties.

Background

On the evening of October 10, 1993, Jarrod Filion and three friends went to Buffum's, a grocery store located in Bellows Falls, Vermont, to purchase tacos and cheese for dinner.[3]  While at the store, Filion, who was seventeen years old at the time, and his friends decided to build a pyramid of food in one of the

_____

[1]Buffum's, Earl and Julia Buffum, Fairbanks, Brochey, and Clayton are referred to collectively as the Buffum defendants.

[2]Fontaine, Kulp, and the Town of Bellows Falls are referred to collectively as the Bellows Falls defendants.

[3]Bellows Falls is located on the Vermont-New Hampshire border, directly across the Connecticut River from Walpole, New Hampshire.

2

store's aisles. To this end, the group split up to gather food items. Plaintiff proceeded down one of the aisles and removed a wine cooler from one of the store shelves.

At this point, plaintiff alleges that he was walking down an aisle toward the front of the store when he was confronted by defendants Fairbanks and Brochey, who accused him of shoplifting.[4] Plaintiff, Fairbanks, and Brochey then proceeded to the upstairs store office, where Fairbanks telephoned the local police, informed them he had detained a shoplifter, and requested that an officer be sent over.

Before the police arrived, plaintiff fled the store, leaving the wine cooler on the desk in the store office. Fairbanks purportedly yelled, "Stop him!" or "Get him!", and defendants Brochey and Clayton ran out of the store in pursuit of plaintiff.

Brochey, Clayton, and an unidentified Buffum's customer

---

[4]The parties disagree over where plaintiff was first approached by the store employees and accused of shoplifting. Plaintiff states he was in an aisle near the front of the store, but had not passed through the area where the cash registers are located. Deposition of Jarrod S. Filion at 33, 36; see also Affidavit of Matthew Hunter ¶¶ 5-7 (attached to Plaintiff's Objection). Defendants Fairbanks and Brochey state that they stopped plaintiff after he exited the first set of the store's double set of doors, and just before he was about to exit the second set into the parking lot. Deposition of Frank Fairbanks at 23; Deposition of Gary E. Brochey at 16-17.

To the extent that the location where plaintiff was stopped by the store employees is material to plaintiff's claims, the court assumes plaintiff was stopped inside the store.

chased plaintiff across the store parking lot, down an embankment, and across a railroad trestle into New Hampshire. The pursuit ended in New Hampshire where the two Buffum's employees and the customer caught up with plaintiff and detained him until the police arrived.

Sgt. Harry Kulp, of the Bellows Falls police department, was the first police officer to arrive in New Hampshire. He took custody of plaintiff from the store employees and patted him down to check for weapons. Officer Nelson S. Fontaine, Jr., also of the Bellows Falls police department, arrived shortly thereafter.

Plaintiff was held by Kulp and Fontaine until a New Hampshire State Police trooper and plaintiff's father arrived. The state trooper then served plaintiff with a citation, prepared by the Bellows Falls police, to appear in Vermont District Court in Brattleboro, Vermont, on November 8, 1993, to answer a charge of "Retail Theft". After plaintiff was served with said citation, he was released to his father.

After plaintiff's November 8 arraignment date was rescheduled several times, the retail theft charge was dismissed on December 23, 1993, due to the deputy state's attorney's decision to nol pros the case.

Plaintiff filed the instant action in this court on December 15, 1993.

<u>Discussion</u>

A. <u>Summary Judgment Standard</u>

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate if the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The summary judgment process

> involves shifting burdens between the moving and the nonmoving parties. Initially, the onus falls upon the moving party to aver "'an absence of evidence to support the nonmoving party's case.'" <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). Once the moving party satisfies this requirement, the pendulum swings back to the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)). . . .

<u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993), <u>cert. denied</u>, ___ U.S. ___, 114 S. Ct. 1398 (1994).

"Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Mottolo v. Fireman's Fund Ins. Co.</u>, 43 F.3d 723, 725 (1st Cir. 1995) (quoting <u>Celotex Corp.</u>, <u>supra</u>, 477 U.S.

5

at 322). When the nonmoving party bears the burden of proof at trial and fails to make such a showing, "there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law." Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994) (citing Celotex Corp., supra, 477 U.S. at 322-23), cert. denied, 63 U.S.L.W. 3817 (U.S. May 15, 1995) (No. 94-1416).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the nonmoving party's favor. Anderson, supra, 477 U.S. at 255; Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1159 (1st Cir. 1994)

B. The Bellows Falls Defendants' Motion for Summary Judgment

The Bellows Falls defendants move for summary judgment as to Counts I, III, and IV of the complaint.

### 1. Count I

In Count I of his complaint, plaintiff alleges that defendants Fontaine and Kulp "had no authority to arrest or detain Plaintiff in New Hampshire, but used their office and

6

insignia as a pretense to deprive Plaintiff of his constitutional rights." Complaint ¶ 32. Plaintiff further alleges that "[t]he actions of the Defendants Fontaine and Kulp deprived the Plaintiff of liberty without due process of law, in violation of his rights under the Constitution of the United States." Id. ¶ 33.

To prevail on these constitutional claims under 42 U.S.C. § 1983, plaintiff must show (1) that he "was deprived of a right, immunity, or privilege secured by the constitution or laws of the United States," and (2) that such deprivation was caused "by a person acting under color of state law." Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir.) (citing Parratt v. Taylor, 451 U.S. 527, 535 (1982), overruled on other grounds, Daniel v. Williams, 474 U.S. 327 (1986)), cert. denied, 502 U.S. 879 (1991).

### a. Deprivation of Liberty Without Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

Plaintiff alleges that defendants Kulp and Fontaine deprived him of his liberty without due process when they took custody of him from the Buffum's employees, placed him prone, spread-eagle across the front hood of a police cruiser, patted him down for

7

weapons, and then detained and questioned him regarding the alleged shoplifting incident at Buffum's.[5]

"'As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" Albright v. Oliver, ___ U.S. ___, ___, 114 S. Ct. 807, 812 (1994) (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)). Further, "[w]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" Id. at 813 (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

The Supreme Court has explicitly held "that all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham, supra, 490 U.S. at

---

[5]Plaintiff's complaint does not contain any allegations to support a procedural due process claim. Accordingly, the court treats plaintiff's Fourteenth Amendment claim as one alleging a violation of his substantive due process rights.

8

395. In so holding, the Court reasoned that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Id.

More recently, the Supreme Court has held that the right to be free from prosecution without probable cause "is properly analyzed under the Fourth Amendment rather than under the heading of substantive due process." Albright, supra, 114 S. Ct. at 814 (Ginsberg, J., concurring).

The Fourth Amendment provides that

> The right of the people to be secure in their persons, houses, papers, and effects, against all unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The deprivations of liberty plaintiff complains of are all related to defendants' search and seizure of him following the alleged shoplifting incident at Buffum's. Such deprivations clearly fall within the scope of the Fourth Amendment's protections. E.g., United States v. Walker, 924 F.2d 1, 3 (1st

9

Cir. 1991) (the question of whether a police officer has reasonable grounds to stop and search an individual "falls directly within the Fourth Amendment's proscription against unreasonable searches and seizures."). Under these circumstances, the court finds and rules that plaintiff must rely on the Fourth Amendment for relief rather than the "scarce and open-ended" guideposts in the area of substantive due process. Collins, supra, 503 U.S. at 125.

### b. Unreasonable Search and Seizure

Defendants Kulp and Fontaine move for summary judgment as to plaintiff's Fourth Amendment claims on the grounds that (1) no Fourth Amendment violation occurred and (2) they are entitled to qualified immunity. Plaintiff counters (1) that his Fourth Amendment rights were violated and (2) that defendants are not entitled to qualified immunity because there was no probable cause to "arrest" plaintiff and because defendants lacked the authority to arrest plaintiff in New Hampshire. The court turns first to the issue of qualified immunity.

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

10

reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To be "clearly established", the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

"Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.'" Elder v. Holloway, ___ U.S. ___, ___, 114 S. Ct. 1019, 1023 (1994). Further, "the operative inquiry on qualified immunity is not whether the defendants actually abridged the plaintiffs' constitutional rights, but whether defendants' conduct was objectively unreasonable, given the constitutional understandings then current." Crooker v. Metallo, 5 F.3d 583, 585 (1st Cir. 1993). See also Creighton, supra, 483 U.S. at 640; Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992). This standard is intended to give "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law,'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986)), "because 'officials should not err always on the side of caution' because they fear being sued," id. (quoting Davis v. Scherer, 468

11

U.S. 183, 196 (1984)).

Thus, "[o]fficials are immune unless the law clearly proscribed the actions they took." Brennan v. Hendrigan, 888 F.2d 189, 192 (1st Cir. 1989) (citing Davis, supra, 468 U.S. at 191). In the words of the First Circuit, "This is as it should be: 'Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" Id. (quoting Harlow, supra, 457 U.S. at 818).

Plaintiff asserts that defendants' stop, search, detention, and citation of him for retail theft violated his clearly established Fourth Amendment rights.

### (1) The State of Fourth Amendment Law

As of October 10, 1993, it was, without doubt, clearly established that "unreasonable" searches and seizures violate the Fourth Amendment. It was also clearly established that the Fourth Amendment's prohibition against unreasonable searches and seizures "governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest. Davis v. Mississippi, 394 U.S. 721 (1969); Terry v. Ohio, 392 U.S. 1, 16-19 (1968).'" United States v. Mendenhall, 446 U.S.

12

544, 551 (1980) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)).[6]  Similarly, "a pat-down of even the slightest character [is] a search" covered by the Fourth Amendment.[7]  United States v. Villanueva, 15 F.3d 197, 199 (1st Cir.), cert. denied, ___ U.S. ___, 114 S. Ct. 2174 (1994).

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

---

[6]"A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" Graham, supra, 490 U.S. at 395 n.10 (quoting Terry, supra, 392 U.S. at 19 n.16); see also United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994). "'[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Sealey, supra, 30 F.3d at 9 (quoting Mendenhall, supra, 446 U.S. at 554).

[7]Under Terry, supra, a police officer may "conduct a patdown search where the officer is justified in believing that the person is armed and dangerous to the officer or others." United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994) (citing Terry, supra, 392 U.S. at 24). However, "[t]his protective search must be 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" Id. (citing Terry, supra, 392 U.S. at 26).

13

Graham, supra, 490 U.S. at 396. Further, the "reasonableness" of an officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citing Terry, supra, 392 U.S. at 20-22).

The First Circuit employs the following two-part inquiry to determine whether a search and seizure was "unreasonable" and therefore violative of the Fourth Amendment: first, a court must consider "'whether the officer's action was justified at its inception," and, second, the court must consider whether the officer's conduct "'was reasonably related in scope to the circumstances which justified the interference in the first place.'" Villanueva, supra, 15 F.3d at 199 (quoting Terry, supra, 392 U.S. at 20). See also United States v. Walker, 924 F.2d 1, 3 (1st Cir. 1991). "'[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Walker, supra, 924 F.2d at 3 (quoting Terry, supra, 392 U.S. at 21).

"When applying this familiar two-prong test, the court must view the circumstances relating to the stop and frisk as a whole." Walker, supra, 924 F.2d at 3 (citing United States v.

14

<u>Stanley</u>, 915 F.2d 54, 55 (1st Cir. 1990)); <u>see also</u> <u>United States</u> <u>v. Trullo</u>, 809 F.2d 108, 111 (1st Cir.) (the circumstances before the officer are to be considered as a whole, not dissected and viewed singly), <u>cert. denied</u>, 482 U.S. 916 (1987).

In applying the two-prong test, the court is essentially balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" <u>Horta v. Sullivan</u>, 4 F.3d 2, 13 (1st Cir. 1993) (quoting <u>Tennessee v. Garner</u>, 471 U.S. 1, 8 (1985)).[8]

Under the Fourth Amendment, "police-citizen encounters which fall short of full scale arrests . . . must be justified by reasonable suspicion proportional to the degree of the intrusion," <u>Trullo</u>, <u>supra</u>, 809 F.2d at 110, whereas "other detentions that the law deems sufficiently coercive . . . -- detentions that are sometimes called '*de facto* arrests'"--require probable cause, <u>United States v. Zapata</u>, 18 F.3d 971, 975 (1st Cir. 1994) (citing <u>Florida v. Royer</u>, 460 U.S. 491, 506 (1983)

_____

[8]In the context of a qualified immunity inquiry, "'[w]henever [such] a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under <u>Harlow</u>.'" <u>Horta</u>, <u>supra</u>, 4 F.3d at 13 (quoting <u>Benson v. Allphin</u>, 786 F.2d 268, 276 (7th Cir.), <u>cert. denied</u>, 479 U.S. 848 (1986)).

(White, J.); United States v. Quinn, 815 F.2d 153, 156 (1st Cir. 1987)).  Here, plaintiff acknowledges that he was taken into custody by the police on the evening of October 10, 1993, but does not believe he was ever arrested.  Filion Deposition at 119-20.  Further, the court finds that a reasonable person in plaintiff's position would not have felt free to leave the scene after the police took custody of him from the store employees, but would also not have understood his circumstances "to be tantamount to being under arrest."  Zapata, supra, 18 F.3d at 975.  Accordingly, the court evaluates the constitutionality of defendants' initial stop and search of plaintiff by determining whether such conduct was "justified by reasonable suspicion proportional to the degree of the intrusion."  Trullo, supra, 809 F.2d at 110.

### (2) Defendants' Conduct

On the evening of October 10, 1993, the Bellows Falls police department received a telephone call from Frank Fairbanks, a manager at Buffum's.  Fairbanks indicated that he had detained a shoplifter and requested that a police officer be sent to the store.

At 8:55 p.m., Officer Nelson Fontaine was notified by the police dispatcher of the alleged retail theft and responded to

16

the call.  However, before Fontaine arrived at Buffum's,
plaintiff fled the store's office, where he was being detained by
Fairbanks.  Filion Deposition at 45; Fairbanks Deposition at 29.

When Fontaine arrived at Buffum's, he spoke to Fairbanks,
who told him that plaintiff had been detained for shoplifting a
wine cooler, had taken flight, and was being pursued by two store
employees.  Deposition of Nelson F. Fontaine, Jr., at 13-15;
Fairbanks Deposition at 34.  Fontaine then left Buffum's and
proceeded to drive in the direction where plaintiff had fled.
Fontaine also radioed Sgt. Harry Kulp to inform him that the
shoplifting suspect had fled Buffum's and was headed in the
direction of the railroad trestles which connect Vermont with New
Hampshire.  Deposition of Harry Kulp at 13-14.

At this point, Kulp called his dispatcher and asked him to
contact the New Hampshire dispatcher to find out if a Walpole
police officer was on duty.[9]  Id. at 14-15.  Kulp then proceeded
across a bridge into New Hampshire and toward the railroad
trestles, at which time he states,

> I saw three individuals coming towards me,
> one on either side of the one who I assumed,

---

[9]Kulp states that his dispatcher subsequently called back to
inform him that Walpole did not have an officer available, but
that the New Hampshire State Police had been contacted and were
sending a trooper from its Keene, New Hampshire, barracks.  Kulp
Deposition at 21.

17

at the time, was the accused, because I recognized Mr. Brochey and Mr. Clayton on either side. All of -- three of them -- looked extremely agitated. They appeared to be squabbling with each other.

Id. at 15.

Kulp states that, as he got out of his car,

there was still some struggling, words being exchanged. I saw that the situation was not in everyone's best interest. I didn't know what the individual in the middle had done or what was going on.

My personal impression at the time was: If I didn't take custody of the individual, we'd have a melee. And I didn't feel safe with this individual, not knowing what had transpired at that store.

So I took him physically from the store employees, who had offered to take him back across the river, and told them that, no, I would take care of the situation.

I then took the individual, who I later found to be Jarrod Filion, and for my own safety, I put him prone, spread-eagle, across the front hood of my cruiser and advised him to calm down, that I was going to pat him down.

I advised him why I was patting him down. I didn't want him to make any sudden moves because if he makes any sudden moves or came over the car, I would place him on the ground. I don't want it to be an unpleasant experience for both us. . . . I patted him down.[10] During the pat-down, he attempted to come off the cruiser a couple of times. I pushed him back down on the car with my hand to his back, told him to calm down. He

_____

[10]Plaintiff states that this "pat down" search took approximately one minute. Filion Deposition at 100-01. The search did not uncover any weapons.

18

> wanted to come off the car.  I told him as
> soon as he calmed down, I would let him off
> the car.

Id. at 15-17.

Kulp further states that once plaintiff calmed down, he "let him come off the cruiser, at which point he told me he was cold." Id. at 18.  Kulp then purportedly directed Fontaine, who had just arrived at the scene, to allow plaintiff to sit in the back of his cruiser.[11]

With respect to his initial contact with the police, plaintiff states that Kulp placed him "spread-eagle" on the hood of his car, with his stomach, chest, and arms flat on the car, and "frisked" him.  Filion Deposition at 65.  Plaintiff further states that Kulp left him in that position "for about a half hour until another police officer arrived."  Id. at 67.

During this time, plaintiff states,

> A.  . . . .  I asked the officer several
> times to be moved inside the car because I
> was cold.
> Q.  And what did he say?
> A.  He told me to lay right there.

---

[11]Fontaine, the second officer to arrive at the scene, states that he arrived "at least a minute behind" Sergeant Kulp. Fontaine Deposition at 19.  Fontaine further states that plaintiff was "on the hood of the car when I pulled up.  I can't say that he was on the hood of the car for anymore than another ten seconds after I got out of my vehicle, walked up to the front of Sergeant Kulp's vehicle and Sergeant Kulp asked me to take him back, put him in the back seat of my cruiser."  Id. at 38-39.

19

        Q.   Okay.   What happened next after the
half hour?
        A.   Another officer took me into his car.
I sat in there with the door open.   And I
asked him if he'd turn on the heat and he
did.
        And I just asked him questions like, "Why
are they holding me?"   If they can do this?
And I told him that the employees, like, beat
me or whatever I used, like, abused me or
whatever.   And he said that I'm going to have
to file charges with the New Hampshire
Police.

Id. at 68.[12]

Plaintiff remained in the back of Officer Fontaine's cruiser

until after a New Hampshire State Police trooper and plaintiff's

father arrived at the scene.[13]   Filion Deposition at 68-71.

During the time Filion was detained by defendants,

defendants questioned the store employees and plaintiff's three

friends.   Filion Deposition at 66, 103.   Officer Fontaine states

that based upon the witness statements, his brief discussion with

Fairbanks, and his discussion with plaintiff, he decided to cite

---

        [12]For the purposes of deciding whether defendants are
entitled to qualified immunity, the court does not resolve the
dispute over how long plaintiff was kept on the hood of Kulp's
police car, but instead assumes that plaintiff was kept there, as
plaintiff testified in his deposition, for "about a half hour."
Filion Deposition at 67.

        [13]The Bellows Falls Police Department's dispatch records
indicate that the state trooper arrived at the scene at 9:31 p.m.

20

plaintiff for retail theft.[14]  Fontaine Deposition at 44-52.

Officer Fontaine subsequently prepared a citation for retail theft, which was served on plaintiff by the New Hampshire State Police trooper who had arrived at the scene earlier.  The police dispatch records indicate that plaintiff was cited for retail theft at 10:18 p.m., approximately one hour and twenty minutes after plaintiff was first stopped by Kulp.  Plaintiff was then released to his father's custody.

### (3)  Lack of Authority

Plaintiff asserts that Kulp and Fontaine, both of whom are police officers for the Town of Bellows Falls, Vermont, are not entitled to qualified immunity because they lacked the statutory authority to "arrest" plaintiff in New Hampshire.  In support

---

[14]Under Vermont law,

> A person commits the offense of retail theft when he, with intent of depriving the merchant wrongfully of the lawful possession of his merchandise,
> (1) takes and carries away or causes to be taken and carried away . . . any merchandise from a retail mercantile establishment without paying the retail value of the merchandise . . . .

VT. STAT. ANN. tit. 13, § 2575 (attached to Defendants' Motion as Exhibit 8).

thereof, plaintiff cites several Vermont statutes governing defendants' authority to make arrests.

However, "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." Davis v. Scherer, 468 U.S. 183, 194 (1984). Instead, "'[a] plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that *those* rights were clearly established . . . .'" Elder, supra, 114 S. Ct. at 1023 (quoting Davis, supra, 468 U.S. at 197).

An unauthorized arrest is not unreasonable *per se* by Fourth Amendment standards. E.g., Abbott v. Crocker, 30 F.3d 994, 997 (8th Cir. 1994). Thus, plaintiff cannot overcome defendants' qualified immunity by showing that the arrest of plaintiff in New Hampshire violated state law. Instead, plaintiff must show that such arrest violated his clearly established Fourth Amendment rights.

### (4) The Initial Stop and Search

At the time of the October 14, 1993, incident, the Fourth Amendment clearly required defendants' initial stop and search of

22

plaintiff to be supported by a "reasonable suspicion proportional to the degree of the intrusion." Trullo, supra, 809 F.2d at 110.[15]

When defendant Kulp first encountered plaintiff in the hands of the two Buffum's employees, he was aware that an individual Buffum's had detained and accused of shoplifting had fled the store and headed in the direction where this initial encounter occurred. Under these circumstances, the court finds that the decision to seize plaintiff from the store employees and conduct a brief pat-down was supported by reasonable suspicion, and that a reasonable officer in Kulp's position would not have understood that his actions were in violation of plaintiff's clearly established Fourth Amendment rights.

---

[15]

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

23

<u>(5) The Detention</u>

Following the brief pat-down of plaintiff, Kulp ordered plaintiff to remain in a spread-eagle position over the hood of the cruiser while Kulp questioned the store employees. As soon as the second police officer arrived at the scene, plaintiff was permitted to sit down inside one of the police cruisers while the questioning of witnesses continued and while the defendants waited for the arrival of a New Hampshire State Police trooper and plaintiff's father. Defendants' detention of plaintiff lasted approximately one hour and twenty minutes.

The restrictions on plaintiff's freedom of movement and the length of his detention do not automatically transform the stop of plaintiff into a *de facto* arrest. <u>Quinn</u>, <u>supra</u>, 815 F.2d at 157. Accordingly, under applicable Fourth Amendment standards, defendants' conduct must be justified "by reasonable suspicion proporitonal to the degree of the intrusion." <u>Trullo</u>, <u>supra</u>, 809 F.2d at 110.

With respect to Kulp's decision to keep plaintiff in a spread-eagle position over the hood of his cruiser "for about a half hour until another police officer arrived," Filion Deposition at 67, the court finds that a reasonable police officer would not have believed this conduct to be unlawful under the circumstances. Although plaintiff was only accused of

24

shoplifting a wine cooler, he had already demonstrated he was a flight risk. Accordingly, it was not objectively unreasonable for Kulp to restrict plaintiff's freedom of movement until a second officer arrived.

With respect to the length of plaintiff's detention, the court notes that both the First Circuit and the Supreme Court have declined to adopt a "hard-and-fast time limit for a permissible *Terry* stop . . . ." United States v. Sharpe, 470 U.S. 675, 686 (1985); see also Quinn, supra, 815 F.2d at 157 ("'[T]here is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the fourth amendment." (quoting United States v. Davies, 768 F.2d 893, 901 (7th Cir. 1985)). Rather, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, [a court must] consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Sharpe, supra, 470 U.S. at 686. "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases

25

the court should not indulge in unrealistic second-guessing."
Id.

Here, the length of plaintiff's detention was affected by several factors. First, the police officers needed to question the store employees. When plaintiff's three friends arrived at the scene, they were also questioned. Second, because plaintiff had taken flight across the Vermont-New Hampshire border, defendants needed to wait until a New Hampshire police officer arrived to cite plaintiff for retail theft. It took approximately one-half hour for a New Hampshire State Police trooper to arrive. Third, because plaintiff was a minor at the time of the incident, his parents were contacted and asked to come pick him up from the scene. The evidence shows that plaintiff was released shortly after his father's arrival.

Under these circumstances, the court finds that a reasonable officer would not have understood that the detention of plaintiff, albeit lengthy, violated plaintiff's clearly established Fourth Amendment rights.[16]

_____

[16]Even assuming arguendo that the detention of plaintiff constituted a *de facto* arrest justifiable only by probable cause, the court finds the presence of probable cause to be at least arguable under the circumstances. See section 2.b.(6), infra (explaining probable cause in the context of the qualified immunity inquiry).

### (6) The Citation for Retail Theft

The parties agree that defendants needed probable cause to cite plaintiff for retail theft.

"[P]robable cause exists when '"the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense."'" Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) (quoting United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964))). See also Hunter, supra, 502 U.S. at 228.

Because "'[t]he qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law,"'" Rivera, supra, 979 F.2d at 263 (quoting Hunter, supra, 502 U.S. at 229 (quoting Malley, supra, 475 U.S. at 343, 341)), law enforcement officers are "entitled to qualified immunity 'so long as the presence of probable cause is at least arguable,'" id. (quoting Ricci v. Urse, 974 F.2d 5, 7 (1st Cir. 1992)). See also Hunter, supra, 502 U.S. at 229 ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity.").

27

Based on their questioning of the store employees, plaintiff, and plaintiff's friends, defendants Kulp and Fontaine determined that there was probable cause to cite plaintiff for retail theft in violation of Vt. Stat. Ann. tit. 13, § 2576. The court finds that the existence of probable cause was "at least arguable." Rivera, supra, 979 F.2d at 263.

At bottom, the court finds and rules that reasonable police officers faced with the same circumstances as those faced here by defendants Kulp and Fontaine would not have believed that their conduct violated plaintiff's clearly established Fourth Amendment rights.[17] The court therefore finds that Kulp and Fontaine are entitled to qualified immunity in this case.

Defendants' motion for summary judgment is granted as to defendants Kulp and Fontaine on Count I.

### c. Town of Bellows Falls

Count I includes a companion municipal liability claim against the Town of Bellows Falls.

_____

[17]In arguing for and against the qualified immunity defense, the parties do not cite any factually analogous precedent to aid the court's determination of whether defendants' conduct violated plaintiff's clearly established Fourth Amendment rights. However, this court's extensive review of the relevant caselaw did not uncover precedent that would support a finding that defendants' conduct was objectively unreasonable.

28

It is well established that "'a municipality cannot be held liable *solely* because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Collins, supra, 503 U.S. at 121 (quoting Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691 (1978)); see also Gaudreault v. Salem, 923 F.2d 203, 209 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.'" Collins, supra, 503 U.S. at 121 (quoting Monell, supra, 436 U.S. at 694).

Plaintiff asserts that his "unlawful arrest and detention in New Hampshire was caused in part by the municipal custom of the Town of Bellows Falls . . . to allow their police officers to rely upon the judgment of the store owners in finding probable cause to arrest." Plaintiff's Objection ¶ 10.

The court finds that the evidence presented is entirely insufficient to support a finding that it was the municipal custom of Bellows Falls to allow its police officers to rely on the judgment of store owners in finding probable cause to arrest.

29

Instead, as discussed _infra_ at section C.1., the evidence in this case shows that the Bellows Falls police officers involved in this incident conducted an independent investigation of the facts prior to citing plaintiff for retail theft.

Further, there is no evidence that the police department had, on prior occasions, allowed its police officers to rely on the judgment of store owners in finding probable cause to arrest in retail theft cases. See _Oklahoma City v. Tuttle_, 471 U.S. 808, 822-24 (1985) (one incident does not establish a municipal policy or custom).

Defendants' motion for summary judgment on Count I is accordingly granted as to defendant Town of Bellows Falls.


2. Count III

In Count III of his complaint, plaintiff alleges that defendants Fontaine, Kulp, Fairbanks, Brochey, and Clayton conspired to deprive him of his civil rights.

> A civil rights conspiracy is "a combination
> of two or more persons acting in concert to
> commit an unlawful act, or to commit a lawful
> act by unlawful means, the principal element
> of which is an agreement between the parties
> 'to inflict a wrong against or injury upon
> another,' and 'an overt act that results in
> damages.'"

Santiago v. Fenton, 891 F.2d 373, 389 (1st Cir. 1989) (quoting Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754 (1980) (quoting Rotermund v. United States Steel Corp., 474 F.2d 1139, 1145 (8th Cir. 1973))). "[F]or a conspiracy to be actionable under section 1983 the plaintiff has to prove that 'there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws.'" Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (quoting Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980)) (alteration in Earle). See also Brennan v. Hendrigan, supra, 888 F.2d at 195.

The actions of state actors Fontaine and Kulp which form the basis of plaintiff's conspiracy claim are the same actions which form the basis of the Fourth Amendment claim plaintiff asserts in Count I. The court has determined herein that defendants Fontaine and Kulp are entitled to qualified immunity from plaintiff's Fourth Amendment claim. Such immunity necessarily extends to plaintiff's conspiracy claim since said claim is based on the same conduct. The court therefore grants the Bellows Falls defendants' motion for summary judgment as to Count III.

C.  The Buffum Defendants' Motion for Summary Judgment

The Buffum defendants move for summary judgment as to Counts II, III, IV, and V of plaintiff's complaint.

1.  Count II

In Count II of his complaint, plaintiff alleges that defendants Fairbanks, Brochey, and Clayton violated his constitutional rights by forcibly detaining him in New Hampshire. Complaint ¶¶ 35-38.

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution."  Collins, supra, 503 U.S. at 120.  Therefore, in order for Count II to succeed, plaintiff must establish that the above-named defendants were acting under color of state law when they detained plaintiff and that the detention violated plaintiff's constitutional rights.

In Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982), the Supreme Court set forth the following two-part test for determining whether "conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State:"

> First, the deprivation must be caused by the
> exercise of some right or privilege created
> by the State or by a rule of conduct imposed
> by the State or by a person for whom the

32

> State is responsible. . . . Second, the
> party charged with the deprivation must be a
> person who may fairly be said to be a state
> actor. This may be because he is a state
> official, because he has acted together with
> or has obtained significant aid from state
> officials, or because his conduct is
> otherwise chargeable to the State. Without a
> limit such as this, private parties could
> face constitutional litigation whenever they
> seek to rely on some state rule governing
> their interactions with the community
> surrounding them.

In recent cases involving stores and accused shoplifters, courts have made it clear that

> a store and its employees cannot be held
> liable under § 1983 unless:
>   (1) the police have a pre-arranged plan
> with the store; and
>   (2) under the plan, the police will arrest
> anyone identified as a shoplifter by the
> store without independently evaluating the
> presence of probable cause.

Cruz v. Donnelly, 727 F.2d 79, 81 (3d Cir. 1984). Accord

Hernandez v. Schwegmann Bros. Giant Supermarkets, Inc., 673 F.2d

771, 772 (5th Cir. 1982).

Here, the defendant store employees detained plaintiff under

Vt. Stat. Ann. tit. 13, § 2576(a), which provides in pertinent

part,

> Any merchant who has reasonable cause to
> believe that a person has committed or
> attempted to commit retail theft may detain
> the person on or in the immediate vicinity of
> the premises of a retail mercantile

33

> establishment, affording the person the opportunity to be detained in a place out of public view if available, in a reasonable manner which may include the use of reasonable force and for a reasonable length of time for any of the following purposes:
>
> (1) To request and verify identification;
>
> (2) To make reasonable inquiry as to whether the person has in his possession unpurchased merchandise and, if unpurchased, to recover the merchandise;
>
> (3) To inform a law enforcement officer of the detention of the person and surrender that person to the custody of a law enforcement officer; and
>
> (4) In the case of a minor, to inform a law enforcement officer, and, if known or determined, the parent or parents, guardian or other person having supervision of the minor of his detention and to surrender custody of the minor to the law enforcement officer, parent, guardian or other person.

It is plaintiff's position that the defendant store employees were acting under color of state law when they detained plaintiff under VT. STAT. ANN. tit. 13, § 2576(a).  However, section 2576(a) "does not compel merchants to detain shoplifters, but merely permits them to do so under certain circumstances." White v. Scrivner Corp., 594 F.2d 140, 143 (5th Cir. 1979). Accordingly, the court finds that "[a]ction by a private party pursuant to this statute, without something more, [is] not sufficient to justify a characterization of that party as a 'state actor.'"  Lugar, supra, 457 U.S. at 939 (citing Flagg

34

Bros., Inc. v. Brooks, 436 U.S. 149 (1978)); see also Scrivner, supra, 594 F.2d at 143 ("Absent some compulsion or some overt state involvement, no state action can be found because of the mere existence of the statute."). To hold otherwise would subject private parties to "constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." Lugar, supra, 457 U.S. at 937.

Plaintiff asserts that there is "something more" in this case, Lugar, supra, 457 U.S. at 939; namely, concerted action between the store employees and the Bellows Falls police.

The undisputed facts of this case indicate that after plaintiff was accused of shoplifting by two Buffum's employees, he was brought to the store office where defendant Fairbanks called the police and told them he had detained a shoplifter and wanted a police officer sent to the store. Fairbanks Deposition at 27; Filion Deposition at 41.

After the call to the police was made, plaintiff fled from the store with defendants Fairbanks, Brochey, and Clayton in pursuit. Fairbanks subsequently gave up his pursuit and returned to the store, where he spoke with Officer Fontaine. Fairbanks indicated he believed plaintiff had "gone across the train tracks

35

and the trestle," Fairbanks Deposition at 34, at which time Officer Fontaine "radioed for Sergeant Kulp, explained that the subject had taken off from the store[,] [a]nd [] drove down to the area of Island Park, which is where the train trestles are," Fontaine Deposition at 15.

Sergeant Kulp, as described herein at pages 18-20, proceeded to cross over the Vermont-New Hampshire border and take custody of plaintiff from Brochey and Clayton, who had caught up with plaintiff and were detaining him.

Plaintiff concedes that while he was still in defendants' custody, Kulp spoke with the store employees and with his three friends. Filion Deposition at 66, 103-15. In addition, Officer Fontaine spoke with plaintiff about the incident at Buffum's. Fontaine also spoke briefly with Fairbanks when he first arrived at Buffum's, but did not speak with him again before citing plaintiff for retail theft. Fontaine Deposition at 42-47.

Based on the statements obtained from the witnesses, including Fontaine's brief discussion with Fairbanks at Buffum's, Fontaine determined that plaintiff should be cited for retail theft. Fontaine Deposition at 44. A citation for retail theft was thereafter served on plaintiff by the New Hampshire State Police trooper at the scene.

Plaintiff contends that this series of events is sufficient to support a finding that the defendant store employees are state actors. The court disagrees.

First, the court finds that the evidence presented does not support a finding that the Bellows Falls police have a pre-arranged plan with Buffum's whereby "the police will arrest anyone identified as a shoplifter by the store without independently evaluating the presence of probable cause." Cruz, supra, 727 F.2d at 81. Instead, the evidence shows that although the police took plaintiff into custody based on the Buffum's employees' identification of him as a shoplifter, they detained and cited plaintiff for retail theft based on their independent evaluation of the presence of probable cause.

Second, the police officers' reliance on statements made by Buffum's employees does not show that the police had a customary or pre-arranged plan with Buffum's for dealing with shoplifters. "Unless he were an eye-witness, a police officer could not make any arrest if he could not rely on information provided by citizens who witnessed the events. Such reliance does not convert the informing part[ies] into [] state actor[s]." Hernandez, supra, 673 F.2d at 772.

37

The court finds that the totality of the evidence presented, even when construed in plaintiff's favor, is insufficient to support a finding that the store employees were acting under color of state law when they detained plaintiff.  Defendants' motion for summary judgment as to Count II is accordingly granted.


2.  Count III

As previously set forth herein, in order for plaintiff's civil rights conspiracy claim to succeed, he must establish that the defendants agreed to deprive him of his Fourth Amendment rights and that an actual deprivation of those rights occurred. Earle, supra, 850 F.2d at 844.  Further, as with any section 1983 claim, plaintiff must establish that the named defendants were acting under color of state law.  Collins, supra, 503 U.S. at 120.

When a civil rights conspiracy claim is asserted against both state actors and private parties, the conspiracy serves as a "mechanism by which to obtain the necessary state action or to impose liability on one defendant for the acts of the others performed in pursuance of the conspiracy." Landrigan, supra, 628 F.2d at 742 (citations omitted).

Plaintiff maintains that "[a] conspiracy existed between the various Defendants because the police officers substituted the judgment of the store employees for their own, as is the practice of the police officers. An agreement existed between the police officers and the store employees because the officers habitually relied upon the judgments and conclusions of the store employees in determining whether probable cause existed." Plaintiff's Objection to the Bellows Falls Defendants' Motion for Summary Judgment ¶ 7.

However, as set forth in section C.1., supra, the court has found the evidence presented by plaintiff to be insufficient to support a finding that there was an agreement between the Bellows Falls defendants and the Buffum defendants whereby the police officers would substitute the judgment of store employees for their own in making probable cause determinations in shoplifting cases. Since there is insufficient evidence of the agreement alleged by plaintiff to exist, there is also no basis for finding that defendants Fairbanks, Brochey, and Clayton were acting under color of state law based on the acts of the police officers. See Landrigan, supra, 628 F.2d at 742.

Moreover, since the court has further determined that defendants Fairbanks, Brochey, and Clayton were not acting under

39

color of state law when they detained plaintiff, there is no independent basis for finding that defendants Fairbanks, Brochey, and Clayton conspired to deprive plaintiff of his civil rights.

The court therefore grants the Buffum defendants' motion for summary judgment on Count III.

D.  Supplemental State-Law Claims

Having granted summary judgment as to all of plaintiff's federal claims, only plaintiff's state-law claims for assault and battery (Count IV) and for false arrest and wrongful detention (Count V) remain.  Under such circumstances, the court is entitled, at its discretion, to either retain supplemental jurisdiction and continue to adjudicate the state-law claims or decline same, leaving the plaintiff to seek relief in state court.  See 28 U.S.C. § 1367(c)(3) (1993).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Under the present facts, the court finds such a prudential course

40

to be appropriate.  Accordingly, the plaintiff's state-law claims
are herewith dismissed without prejudice.


## Conclusion

For the reasons set forth herein, defendants' motions for
summary judgment (documents 17 and 18) are granted as to Counts
I, II, and III of the complaint, and the court declines to
exercise supplemental jurisdiction over the state-law claims in
Counts IV and V of the complaint.  Plaintiff's motion for summary
judgment as to defendants' statutory justification defense
(document 20) and defendants' motion for judgment on the
pleadings (document 19) are accordingly denied as moot.  The
clerk's office shall enter judgment accordingly.

SO ORDERED.


_____
Shane Devine, Senior Judge
United States District Court

June 1, 1995

cc:  Carl D. Hanson, Esq.
     Edward M. Kaplan, Esq.
     Wayne C. Beyer, Esq.